# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 97-KA-00861-SCT

*MICHAEL RAY GENRY*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/24/1997 |
| TRIAL JUDGE: | HON. ROBERT H. WALKER |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JAMES L. DAVIS, III |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | CONO A. CARANNA |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED-3/25/1999 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 4/15/99 |

### EN BANC.

### McRAE, JUSTICE, FOR THE COURT:

¶1. Michael Ray Genry was convicted of and sentenced fifty years under the supervision of the Mississippi Department of Corrections for the January 18, 1996, kidnap, simple assault, sexual assault, and rape of Erika Ladner. Genry argues several issues on appeal. As explained below, reversal is not warranted. Hence, we affirm.

### STATEMENT OF THE CASE

¶2. Michael Ray Genry (hereinafter "Genry") brings this appeal from the Circuit Court of Harrison County, Mississippi, Robert H. Walker, Circuit Judge, presiding. On March 20, 1996, Genry was indicted in a four count indictment. Count I charged Genry under Miss. Code Ann. § 97-3-65(2) with the rape of Erika Ladner on January 18, 1996. Count II charged Genry under Miss. Code Ann. § 97-3-53 with kidnapping her on January 18, 1996. Count III charged aggravated assault under Miss. Code Ann. § 97-3-7(2)(b), and Counts IV and V charged sexual battery under Miss. Code Ann. § 97-3-95(a) against Erika Ladner on January 18, 1996.

¶3. During a five day trial by jury conducted on May 27-31, 1997, Genry, a nineteen year old white male resident of Gulfport, was convicted of forcible rape (Count I), kidnapping (Count II), simple assault (Count III), and sexual battery (Count V). At the close of all the evidence, the trial judge directed a verdict in favor of Genry with respect to the sexual battery charged in Count IV.

¶4. After the jury could not agree upon the punishment to be imposed in Counts I and II, Genry was

subsequently sentenced to consecutive terms of imprisonment as follows: twenty (20) years for the rape charged in Count I; fifteen (15) years for the kidnapping charged in Count II; fifteen (15) years for the sexual battery charged in Count V, and six (6) months for simple assault, a lesser included offense of the aggravated assault charged in Count III. The sentences imposed for rape, kidnapping, and sexual battery totaling fifty (50) years are to run consecutively. The six (6) month sentence imposed for simple assault is to run concurrently with the sentence imposed for sexual battery.

¶5. Judge Walker's sentencing order also invoked the provisions of Miss. Code Ann. §§ 47-7-3(b) and 47-5-171(c) and ordered that Genry ". . . shall not be released on parole until after he had been examined by a competent psychiatrist selected by the State [P]robation and Parole Board and found to be of normal sound mind."

¶6. Genry filed a Motion for New Trial which was denied on June 25, 1997. This timely appeal followed raising the following issues:

**I. WHETHER THE TRIAL COURT ERRED IN FAILING TO SUPPRESS THE PRE-TRIAL STATEMENT MADE BY GENRY ON JANUARY 22, 1996, BECAUSE GENRY'S SIXTH AMENDMENT RIGHTS TO COUNSEL WERE VIOLATED?**

**II. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE INTRODUCTION OF THE PRC ANALYSIS OF DNA AND FURTHER, WHETHER TECHNICIAN JULIA KEMPTON WAS A QUALIFIED EXPERT IN THE FIELD OF DNA?**

**III. WHETHER MISS. CODE ANN. § 47-7-3(b) IS UNCONSTITUTIONALLY VAGUE AND ALLOWS ARBITRARY AND CAPRICIOUS APPLICATION OF THE STATUTE?**

**IV. WHETHER GENRY IS ENTITLED TO A HEARING ON THE NEWLY DISCOVERED EVIDENCE REGARDING THE MISCONDUCT OF CATHY BROCK, SEROLOGIST WITH THE MISSISSIPPI CRIME LAB?**

**V. WHETHER THE CUMULATIVE ERRORS CREATED BY THE TRIAL COURT DEPRIVED GENRY OF A FAIR TRIAL?**

### STATEMENT OF THE FACTS[1]

### THE INCIDENT

¶7. On January 18, 1996, at approximately 6:30 p.m., 17 year old Erika was followed home by a man who approached her in her front yard as she got out of her car. According to Erika, the man held a knife on her, cut her on her arm, placed her in his car, drove her to a secluded spot and sexually assaulted her. After the attack, he drove her home and released her. She immediately told her father. The Sheriff's Department was notified and she was taken to Garden Park hospital where she was examined. That night she was interviewed by investigators to whom she gave a description of the man, his clothing and his car. The officers arrested Genry the following morning at his place of employment. Genry gave two statements to officers, one on January 19, 1996 and one on January 22, 1996. A Motion to Suppress the statements was filed and heard prior to trial. The motion was denied.

### PRETRIAL

## Motion to Suppress

¶8. On January 18, 1996, Investigator Robbie Cox of the Harrison County Sheriff's Department interviewed the victim, Erika, at the hospital and received a description of her assailant as a white male approximately 21 years of age with short hair. Early the next morning another officer remembered an incident which had occurred the day before Erika was attacked. In that incident officers had obtained a description of a vehicle and its tag number. Harrison County Sheriff's deputies obtained a description of that vehicle and located it at West Building Supply.

¶9. Investigators Cox and Stroud, and Captain Resh participated in Genry's arrest for kidnapping and rape. There were no warrants outstanding at that time. Investigator Stroud recognized Genry, a one time neighbor. Stroud approached Genry and asked where he had been the prior evening. Stroud noticed blood on Genry's pant leg. Stroud placed him under arrest and testified that he had no further conversation with Genry. Stroud heard no one make an offer of cooperation. Captain Resh denied asking Genry any questions at the time of his arrest and denied hearing any offers of cooperation. After the arrest Captain Resh had no further contact with Genry.

### January 19, 1996 Statement

¶10. Investigators Cox and Haden interviewed Genry on January 19, 1996, at approximately 13:53 (1:53 p.m.). According to Cox and Haden, Genry was advised of his rights, signified that he understood them, and signed the waiver of rights form. At the time Genry did not appear to Cox to be under the influence of alcohol or drugs and he did not ask for an attorney. He never refused to answer any of the questions, requested an attorney, or invoked his right to remain silent. Cox testified that no promises were made to Genry and he was not threatened or coerced in any manner. Both audio tape was introduced into evidence.

¶11. At the suppression hearing, Genry testified that at the time of his arrest he was 19 years old. The day he was arrested Officer Stroud told him that they needed to take him downtown and ask him a few questions. Officer Cox told him that he was under arrest for kidnapping and rape and "if you cooperate with us, we will see if we can help you out." From that he understood that they would help him get a lesser sentence at trial. He was taken, "in a daze", to the Sheriff's office where he gave a taped statement to the officers. Genry testified that the only hope he could cling onto was what he heard from Officer Cox. Genry has a GED, could read and write, and understood his rights. Genry gave a statement because, "I thought I was going to get help if I did, you know. He told me to cooperate. That is why I did." In his statement Genry admitted to picking up a girl on January 18. He believed her name was Samantha and he admitted to having had sex with her, but claimed that it was consensual.

### January 22, 1996 Statement

¶12. On January 22, 1996, a second statement was taken from Genry. According to Officer Cox, he was contacted by a justice court judge who advised him that, during his initial appearance, Genry had asked to speak with Cox, "because he wanted to tell us the truth about what had occurred." By this time Genry had filled out a petition for appointment of an attorney and one had been appointed. Cox did not contact the attorney and was not aware of anyone contacting Genry's attorney.

¶13. That same afternoon, Officer Cox talked to Genry and reminded him that he had an attorney. Genry was taken to the office and interviewed. Again the interview was recorded by audio and video. Genry was

advised of his rights and again he waived those rights. According to the officers present, Genry did not appear to be under the influence of any drugs or alcohol, he did not invoke his right to remain silent, or request his attorney. The statement was in Cox's opinion, freely and voluntarily given. A transcript of this interview was admitted into evidence. Genry admitted that he had forced Erika into the car and eventually raped her.

¶14. At the suppression hearing, Genry testified that on the night of January 21, 1996, he was locked down but visited with his pastor, his mom and dad, and his ex-girlfriend. His pastor told him to tell the truth, it would help. The following day, at his initial appearance Genry was confused. "Well, I feel like I was being jerked around one way, to this way and that, you know. I had no lawyer to talk to. I ain't -- I don't -- I was confused to the max, you know. That is the best way I can explain it." He was told at the initial appearance that Lisa Collums was his lawyer, but there was no way to contact her. "When you call them from the jail, they either don't accept or you can't get through, and I couldn't write her because I had nothing to write her to."

¶15. Genry testified that he was not told why he was being taken to the contact room. "They don't tell you you got an investigator who wants to talk to you, because they want to get you out there, and then when you out there, you can't get back in because the door is locked." Genry testified that he couldn't think straight when they came to get him and could not recall anything they said. Genry had been on medication in high school and had some in-patient treatment. Genry did not recall telling the judge that he wanted to talk to Officer Cox. On cross-examination, Genry testified that, to the best of his recollection, Cox said that if he cooperated with them, they would help him. Genry admitted telling the jailer he needed to talk to Cox, he wanted to give him a statement, to tell the truth. He told Cox that he was there because his preacher and girlfriend told him to tell the truth. But in Genry's mind, the main reason for giving the statement was to get the help he felt Cox had promised him. Genry gave the statements because he thought he was going to get the help he needed, maybe mental help and some how a lesser sentence.

¶16. Officer Cox denied saying or hearing anyone else say that if Genry cooperated with them he would receive lenient treatment. Stroud heard no offer of cooperation and was not present during the taking of Genry's statement. The other officers that were present at both interviews also testified. At the first interview, Investigator Haden read Genry his rights and testified that Genry did not appear to be under the influence of alcohol or drugs. According to Haden, Genry did not request a lawyer at his arrest or at the interview. Investigator Calvanese, present at the second interview, also testified that Genry signed the waiver of rights form, did not appear to be under the influence of drugs or alcohol, and did not request an attorney. Calvanese heard no offers in exchange for Genry's statement. Nor was Genry threatened or coerced. Investigator Pevey recorded the first interview and concurred that Genry was not influenced, threatened or coerced, did not request an attorney, and gave a free and voluntary statement. Pevey had no personal conversations with Genry.

¶17. The Motion to Suppress the statements was denied.

**THE TRIAL**

¶18. At the trial, the 17 year old victim, Erika, testified that on January 18, 1996, at approximately 6:10 p.m., she was on her way home dressed in a gray sweatshirt, black biker shorts with black shorts over them and tennis shoes. She had just finished a work out at a local fitness center and had stopped to get gas. As she was leaving the gas station she noticed a man sitting in a brown or maroon car. She noticed him

because she thought he was going to pull out at the same time she did. From the station on Highway 49 in Harrison County, she drove to her home on Highway 53 where she lived with her father, stepmother, stepbrother and two male cousins. It was dark when she pulled into her driveway. A car pulled into the driveway behind her and a man got out and began telling Erika that he thought he knew her from some where. As she was saying no and preparing to go into the house, he pulled a knife and put it to her stomach. The man told her that he had been hired to "get her" and that he needed the money. She offered to get him money if he would allow her to go inside. He told her to get in the car. When she refused he grabbed her by the throat and put the knife to her throat and forced her into the car. As he was getting her into the car he cut her elbow. The man wrapped a towel around her bleeding elbow. Erika was taken to Three Rivers Park, about a ten minute drive from her home. When they arrived at Three Rivers, the man crawled over and began to kiss and fondle her. When she pushed him away he shoved her into the seat. After making her take her clothes off, he sexually assaulted and raped her. Erika testified that she feared for her life. After the assault she noticed that she had lost one of her gold and amethyst earrings. She offered to meet her assailant the next day to get her earring. He suggested meeting at the Food World on Highway 49 at 9:00, telling her that he worked near there.

¶19. Erika was taken home about 7:30 p.m. She immediately told her father what had happened and was taken to Garden Park Hospital where she was examined. That evening, to officers, she described her assailant as a white male, approximately 160 pounds with brown hair and a scar on his cheek. She described his clothing and told the officers that he had blood on his pant leg. She testified that as long as she remained calm he was calm, but when she got violent he got violent. She described a dirty car, with bucket seats and a baby seat in the back. She told them about her lost amethyst and gold earring.

¶20. The following day, Erika went to the Sheriff's office to give a statement and to view a line up. As soon as she walked into the line up room she identified her assailant as number 4, Michael Genry. In the courtroom, Erika identified Genry as the man who assaulted her. She testified that she did not consent to getting in the car with him, nor did she consent to any of the sexual acts he performed. She also testified that while she was in the car with him the knife lay on the dash board, he never picked it up again while they were together. She stated that she did not get out when they stopped at the red light on Highway 49 because she had no where to go. She did not leave the car when he got out to urinate. She told Genry she would meet him the next day because she thought as long as she remained calm she would be okay.

¶21. In the court room she identified the knife, his pants, the towel used on her arm, the hair "scrunchy" she lost in the car, her earring, his jacket and his beeper. She also identified her clothing, pictures of the cut on her arm, the bruises on her neck, the baby seat and Genry.

¶ 22. Dr. Overbeck, the ER physician who examined Erika, testified that she was shaking and scared when he examined her. On examination, he found bruising and abrasions about the neck, bruises and abrasions on her back, a 3mm laceration of her left elbow, a jagged laceration of the perineum, and blood in the vaginal vault. Sexual assault kit samples were taken. Officer Cox took possession of the assault kit and the clothing and the clothing and turned them over to an evidence technician.

¶23. After getting a description of the car and the assailant, Cox left and rode around looking for the car. The officers developed a lead on Genry as the suspect and learned that he worked at West Building Supplies. The morning after the assault, Officer Cox and Stroud and Captain Resh went to West, observed the suspect and found a vehicle matching the description they had. Genry owned the vehicle. Genry was

then arrested. During a pat down search they discovered a brown handled lock blade knife. That afternoon, Erika came in and viewed a line up from which she identified Genry. The video of the line up was shown to the jury.

¶24. Officer Cox recounted for the jury the circumstances surrounding the two statements taken from Genry. He testified that Genry was read his Miranda rights and advised that the interview would be taped, both audio and video. Genry indicated that he understood these rights. Both taped statements were played for the jury.

¶25. In his January 19, 1996 statement, Genry admitted to having sex but denied that it was forced on anyone. Genry maintained that the girl had gone with him willingly and that he had accidentally cut her arm while playing with his knife.

¶26. In the January 22, 1996 statement, Genry told the officers that his pastor had told him to tell the truth and that was what he was doing. Genry went on to admit that he "forced" the girl into his car and assaulted her. He continually denied planning any of his actions.

¶27. At trial, officers testified to recovering the towel and a hair "scrunchy" from a roadside near Erika's home. They testified to transporting Genry to Biloxi Regional Medical Center where sexual assault kit samples were taken. The evidence technician described collecting Genry's clothing, processing the car and taking the photographs. The car sears were taken to the crime lab in Jackson and the rape kits to the Gulfport Crime Lab.

## Hearing on Admissibility of DNA Evidence

¶28. The trial court conducted a hearing outside the presence of the jury to determine whether or not the DNA testimony would be allowed in front of the jury in accord with ***Polk v. State***, 612 So. 2d 381 (Miss. 1992).

¶29. The State examined their DNA expert Julie Kempton. Julie Kempton is employed by Cellmark Diagnostics, a private company which does DNA testing in forensic and paternity cases. According to Kempton, Cellmark is the only private lab in the United States accredited for forensic testing by the American Society of Crime Laboratory Directors.

¶30. Kempton is a staff molecular biologist. Her job includes receiving evidence in criminal cases, conducting DNA analysis on the evidence, writing reports as to her findings and testifying in court. Kempton had been doing PCR testing for a year and a half at the time of trial and Cellmark had been doing PCR testing since 1990. Based on her background, education, training and experience, she was accepted by the Defense as an expert in the field of forensic serology and was allowed to testify as an expert in DNA identification by the trial court.

¶31. Kempton described the PCR (polymerase chain reaction) technique as consisting of three steps: extraction, amplification and comparison. In the extraction step the DNA is extracted from the evidence sample. Amplification is making copies of the DNA using a technique that copies six different regions of the DNA, and make millions of copies of the six regions. This enables the lab to take a very small amount of DNA and amplify it so that there is a large enough amount to determine types. Using the amplified DNA, it is determined what types are present at each of the six locations and these types are compared against the types from the know individual's samples. PCR is generally used when there are smaller amounts of DNA

present or when the DNA is degraded due to environmental conditions or passage of time. According to Kempton, PCR testing is generally accepted within the scientific community and has been in use since 1986. Kempton admitted that PCR is not as discriminating a test as RFLP and is more susceptible to contamination because of working with smaller amounts. However, Cellmark did the tests without error in this case.

¶32. Continuing outside the presence of the jury, Kempton testified concerning the receipt and testing of the evidence in this case. She was the only one who tested the substances. DNA was extracted from the panties, the car sears, and the standard received from Genry and Erika. On the panties there was DNA from the non-sperm of more than one person and neither Erika or Genry could be excluded as the sources of the non-sperm DNA. As to the sperm fraction from the panties and one car seat, Erika was excluded as the source but Genry could not be excluded. Genry was excluded as the source of the DNA extracted from one of the car seats and from his pants, but Erika could not be excluded. Utilizing the Cellmark population data base, Kempton testified concerning the frequencies of the combinations of types that were determined in the PCR testing.

¶33. PCR does not allow testimony that a particular person was the depositor of the DNA, but that only whether a person can or cannot be excluded as the depositor.

¶34. Following the testimony, the trial court held that the testimony met the Polk three prong test for admissibility and ruled that it would be allowed before the jury.

## The Forensic Evidence Presented to the Jury

¶35. Cathy Brock, a forensic serologist at the Mississippi Crime Lab was accepted as an expert. She testified to the receipt and testing of the evidence in this case. She testified that Erika was an ABO type O secretor. She was unable to obtain the type of blood from the man's pants or the blue towel. She determined that Genry was an AB secretor. The seminal fluid on the panties showed seminal fluid left by an AB secretor. She found no seminal fluid on the external swab, the vaginal slide or swab, the anal swab; the swab of the left hand or the vaginal wash. Brock sent the package to Cellmark for testing and received it back. Brock's testimony was the subject of a separate motion before this Court. Subsequent to the trial of this case, defense counsel learned that around the time of Genry's trial a letter was sent to all circuit judge's and district attorney's in Mississippi notifying them that Cathy Brock had been removed from the serology section of the Mississippi State Crime Laboratory pending the outcome of an investigation into allegations of disciplinary violations. Because of the nature of the violations the Crime Lab Director informed the courts that it might be inappropriate for Brock to be used an as expert witness in the field of serology in any trial. Genry's motion to remand was denied. It is also important to note that this information concerning Cathy Brock is found no where in the record.

## DNA Evidence

¶36. Julie Kempton repeated her qualifications in front of the jury and the trial court again ruled the testimony would be allowed. She repeated the protocols and safety checks for the jury.

¶37. Kempton explained that in PCR testing the DNA is extracted from a biological fluid and amplified with an enzyme. It is then determined what types are present at each of the six isolated DNA locations, the six markers. The different forms of genes are called alleles.

¶38. Kempton identified the exhibits on which she performed an analysis, the panties, the car seats, his pants and the known samples from the sexual assault kits. In her opinion, Genry could not be excluded on the panties and Erika could not be excluded as the source of blood on Genry's pants. On one car seat Genry could not be excluded and on the other Erika could not be excluded. In determining frequencies, Kempton testified that she would "multiply the frequencies of all six of these markers together to come up with an overall frequency of a profile of a particular person or the DNA from a particular piece of evidence." She was asked if she had an opinion, " with a reasonable degree of scientific certainty regarding the types that you received off the sperm fraction of the panties?" Her answer, "Yes I do." She was then asked:

Q. Miss Kempton, do you have an opinion with a reasonable degree of scientific certainty regarding the frequency that you calculated as to the combination of this type?

A. Yes.

¶39. That opinion was:

A. The overall frequency of a combination of types that was found in the sperm fraction from the panties and the blood sample labeled Genry was approximately 1 in 3700 in the Caucasian population.

¶40. Following this testimony, the State rested. The defense moved for a directed verdict on all counts. The trial court directed a verdict as to Count IV. A record was made concerning Genry's decision not to testify. The defense rested.

¶41. The jury returned a verdict of guilty of rape, kidnapping and sexual battery. On the charge of aggravated assault, Genry was found guilty of the lesser included offense of simple assault.

¶42. In the penalty phase Officer Cox testified that Genry was involved in another attack on the day before he attacked Erika. Genry's father and grandfather testified and asked the jury to allow the judge to determine the sentence. The jury could not reach a decision concerning a life sentence.

¶43. On June 24, 1997, Genry was sentenced by the trial court. In determining a sentence less than life, the trial court relied upon life expectancy tables and noted that all of the offenses were sexually related, including the kidnapping. The defense objected to kidnapping being included as a sexual offense. Genry was sentenced to a total of fifty (50) consecutive years to serve day-for-day without hope of parole under the sexual offender statutes.

## DISCUSSION OF THE ISSUES

### I. WHETHER THE TRIAL COURT ERRED IN FAILING TO SUPPRESS THE PRE-TRIAL STATEMENT MADE BY GENRY ON JANUARY 22, 1996, BECAUSE GENRY'S SIXTH AMENDMENT RIGHTS TO COUNSEL WERE VIOLATED?

¶44. Genry gave two incriminating statements to the authorities. One statement was taken on January 19, 1996, the day after his assault on Erika. The second was taken on January 22, 1996. He now contends that the second statement was inadmissible because it was taken in violation of his Sixth Amendment right to

counsel. The standard of review for such claims is well- settled. "Determining whether a confession is admissible is a finding of fact which is not disturbed unless the trial judge applied an incorrect legal standard, committed manifest error, or the decision was contrary to the overwhelming weight of the evidence." *Balfour v. State*, 598 So. 2d 731, 742 (Miss. 1992).

¶45. On appeal, Genry contends that, pursuant to the decision in *Michigan v. Jackson*, 475 U.S. 625 (1986), his Sixth Amendment right to counsel was violated when the authorities obtained a statement from him after counsel had been appointed for him. In *Michigan v. Jackson*, the United States Supreme Court held that "once [the Sixth Amendment] right to counsel has attached and has been invoked, any subsequent waiver during a police-initiated custodial interview is ineffective." *McNeil v. Wisconsin*, 501 U.S. 171 (1991).

¶46. A defendant's Sixth Amendment right to counsel attaches upon the initiation of adversary proceedings. *Michigan* at 635. Genry asserts that even if his waiver was voluntary and knowing, the questioning in this case violated the prophylactic rule of *Michigan v. Jackson*, 475 U.S. at 635. The Supreme Court held in *Jackson* that "if police initiate interrogation after a defendant's assertion at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." *Id.* The State argues that Genry never took any action to invoke his right to counsel and, therefore, had not triggered the *Jackson* rule.

¶47. This Court addressed this very issue in *Wilcher v. State*, 697 So. 2d 1087 (Miss. 1997) when it stated:

> We recently addressed the effect of appointment of counsel on the rights of a defendant who has never asserted or accepted the counsel. We held that a defendant's Sixth Amendment rights are not violated by questioning in the absence of his attorney unless the defendant has asserted his right to an attorney. *Montoya v. Collins*, 955 F.2d 279 (5th Cir.1992).... We held that "for purposes of *Jackson*, an 'assertion' means some kind of positive statement or other action that informs a reasonable person of the defendant's 'desire to deal with the police only through counsel.' " *Id.* at 283. Thus, we concluded that Montoya's interrogation did not violate the rule of *Jackson* because he did not assert a right to counsel and thereby trigger its protection. Wilcher likewise did not assert a right to counsel in his interrogation by the officers. Under *Montoya* he was not protected by the rule in *Jackson* and voluntarily waived his right to counsel under the Sixth Amendment. *Wilcher* IV, 978 F.2d at 876.

*Wilcher*, 697 So. 2d at 1096-97.

¶48. Nothing in Genry's factual analysis reflects Genry ever requested the presence of his lawyer either prior to or during questioning. Therefore, because Genry has failed to assert or invoke his right to silence or in any way assert his Sixth Amendment right to counsel, his argument on this point is without merit. *Wilcher* at 1097. Furthermore, the evidence indicates that, upon being given his Fifth Amendment/Miranda warnings, Genry waived his right to counsel before each inculpatory statement was given. As a general rule, a defendant may waive his Sixth Amendment right to counsel when he waives his Fifth Amendment rights. *Crawford v. State*, 716 So. 2d 1028, 1038 (Miss. 1998) (*citing Wilcher v. State*, 697 So. 2d 1087, 1096 (Miss. 1997)). Therefore, this assignment of error is without merit.

¶49. Furthermore, it is important to note that Genry initiated contact with Officer Cox. In *Mettetal v.*

*State*, 602 So. 2d 864 (Miss. 1992), this Court stated the following:

> Once the right to counsel has attached, and the accused asserts the right, he is protected from further police-initiated interrogation. Even if the accused has procured an attorney, the accused may still waive the right to have the lawyer present during any police questioning. Nothing in the Sixth Amendment prevents a suspect charged with a crime and represented by counsel from voluntarily choosing, on his own, to speak with police in the absence of an attorney. Although a defendant may sometimes later regret his decision to speak with police, the Sixth Amendment does not disable a criminal defendant from exercising his free will.

*Mettetal*, 602 So. 2d at 868. (citations omitted). ***See also** Hunter v. State*, 684 So. 2d 625, 632 (Miss. 1996) ("The law is well established that an accused person can waive his right to counsel by initiating conversation with law enforcement."). This further supports the State's contention that this issue is without merit.

¶50. Genry also argues that although he voluntarily chose to speak to the police and thus there was no police-initiated interrogation, the pressure he received from his pastor and girlfriend during the night of lock down created a situation "likely to induce [the defendant] to make incriminating statements without the assistance of counsel." *See United States v. Henry*, 447 U.S. 264, 274 (1980).

¶51. The State in this case made a very strong case on the issue of Genry's guilt. The judge properly ruled that Genry's confession was competent because the officers had given Genry all Miranda warnings, Genry knowingly, intelligently and voluntarily waived his rights, there were no offers of any promises of leniency and there were no threats or acts of coercion. Furthermore, there was no proof, or intimation that Genry's pastor or girlfriend made their statements to Genry at the request of any law enforcement officer. "Conduct by third parties not connected with the law enforcement officers in the investigation will not vitiate a confession which might be rendered incompetent and inadmissible if such conduct had been committed by a law enforcement officer." *Darghty v. State*, 530 So. 2d 27, 31 (Miss. 1988). As such, this assignment of error is without merit.

### II. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE INTRODUCTION OF THE PRC ANALYSIS OF DNA AND FURTHER, WHETHER TECHNICIAN JULIA KEMPTON WAS A QUALIFIED EXPERT IN THE FIELD OF DNA?

¶52. Two methods of DNA identification are Restriction Fragment Length Polymorphism testing (RFLP) and Polymerase Chain Reaction (PCR) testing. In the case at bar, the State used evidence gleaned from a PCR analysis tending to demonstrate that Genry fell within a limited population which could not be excluded as the potential donor of semen and seminal fluid found on the victim's panties and a car sear. According to Julie Kempton, the State's DNA expert:

> RFLP is best suited to samples where there is a large amount of DNA and the DNA is in very good condition. PCR is generally used when there are smaller amounts of DNA present or if the DNA is degraded somewhat. That is, that it is not in its fully in tact state due to environmental conditions or passage of time.

¶53. In *Polk v. State*, 612 So. 2d 381 (Miss. 1992), this Court established the ground rules for the admissibility of forensic DNA evidence. Although Polk involved a RFLP analysis, the competency of results

obtained from the PCR methodology is governed by the same three-pronged test adopted in *Polk*:

> I. Is there a theory, generally accepted in the scientific community, that supports the conclusion that DNA forensic testing can produce reliable results?
>
> II. Are there current techniques that are capable of producing reliable results in DNA identification and that are generally accepted in the scientific community?
>
> III. In this particular case, did the testing laboratory perform generally accepted scientific techniques without error in the performance or interpretation of the tests?

*See Polk v. State*, 612 So. 2d at 390 (*quoting Ex parte Perry v. State*, 586 So. 2d 242, 250 (Ala. 1991)).

¶54. Genry contends the trial court erred in permitting the introduction of PCR DNA evidence because the State failed to demonstrate that the evidence and the witness in this case met the requirements of the *Polk* test. We disagree.

¶55. During a predicate hearing initiated by the trial judge, the State produced Kempton, a staff molecular biologist from Cellmark Diagnostics, the only private company in the United State accredited for forensic DNA testing by the American Society of Crime Laboratory Directors. Kempton described the PCR methodology in a step-by-step analysis. She also testified as to the safe guards and controls utilized by Cellmark to avoid contamination of the specimens and to insure the integrity of the testing. There are three steps to the PCR technique: extraction, amplification, and analysis. Cellmark has written and standard protocols for all of its testing, and they were followed in this case. Genry was able to cross-examine Kempton to the fullest extent, and the trial judge specifically noted for the record that he had signed an order authorizing the defense to retain two independent DNA experts to assist in evaluating this DNA testing and understood that they were available for testimony or assistance by the defense in case it needed them.

¶56. Genry supports his argument that PCR DNA testing should not be admitted on a 1992 National Research Council report which declared that saying two DNA patterns match without providing scientific data to support the statement is meaningless. *See Hull v. State*, 687 So. 2d 708, 728 (Miss. 1996). However, many of the concerns expressed by Genry in his brief were specifically addressed by Kempton. Furthermore, the National Research Council issued another report in 1996 which endorsed PCR testing as a reliable technique and dismissed the claim that failure to account for population substructures made "product rule" statistics unreliable. *Crawford v. State*, 716 So. 2d 1028, 1045 (Miss. 1998).

¶57. After hearing the State's predicate testimony, Judge Walker meticulously applied, step by step, the three-pronged test articulated in *Polk*. In addition, by virtue of this Court's holding in *Hull v. State* 687 So. 2d 708 (Miss. 1996), Judge Walker also concluded ". . . that the statistical calculation step is the pivotal element of DNA analysis for the evidence means nothing without a determination of the statistical significance of a match of DNA patterns." *Hull*, 697 So. 2d at 728. Therefore, this Court finds that the trial judge, after hearing the forensic evidence and observing the sincerity and demeanor of the State's expert, considered the DNA analysis in light of *Polk* and found the evidence of PCR DNA testing to be admissible. In light of this finding, it cannot be said that the trial court manifestly erred. "It is well settled that the determination of the admissibility of expert witness testimony rests within the sound discretion of the trial

judge. *Crawford*, 716 So. 2d at 1045. This assignment of error is without merit.

¶58. Alternatively, we also find that any error in admitting the forensic DNA evidence was absolutely harmless in light of the overwhelming evidence of guilt in the present case, including the eyewitness account by the victim, the corroborating admission of Genry as told by Officer Cox, medical corroboration from Dr. Overbeck who examined Erika in the emergency room, and the presence of Erika's gold earring found in a red car seat located inside Genry's vehicle. *See* Miss. R. Evid. 103(a). The admission by the trial court of the DNA evidence did not so prejudice Genry's defense as to constitute reversible error. *Hull* at 728.

¶59. Moreover, with respect to the qualifications of the State's DNA expert, Kempton, the trial judge, after hearing relevant testimony, opined:

> Based upon this witness' background, education, training and experience, I will allow her to testify as an expert in DNA identification testing.

¶60. In *Cooper v. State*, 639 So. 2d 1320 (Miss. 1994), this Court stated:

> The question of whether an individual is qualified to testify as an expert is committed to the sound discretion of the trial court. This Court does not reverse such decisions absent a showing that this discretion has been abused, that is, that the witness was clearly not qualified. *Hall v. State*, 611 So. 2d 915 (1992); *Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Cooper v. State*, 639 So. 2d at 1325. This Court has also stated that "[q]ualification as an expert does not necessarily rest upon the educational or professional degree a witness possesses." *Thompson v. Carter*, 518 So. 2d 609, 614 (Miss. 1987).

¶61. Kempton was qualified to perform the tests and to testify as an expert with respect to her test results and conclusions based on her prior experience with DNA analysis. *Ivy v. State*, 522 So. 2d 740, 743 (Miss. 1988). Kempton testified she had been doing forensic DNA/PCR testing personally for a year and a half. Additionally, after reviewing her qualifications, it is clear that Kempton was an expert in the area in which her testimony was offered. There was no abuse of discretion on the part of the trial court in accepting Kempton as an expert. This assignment of error is without merit.

### III. WHETHER MISS. CODE ANN. § 47-7-3(b) IS UNCONSTITUTIONALLY VAGUE AND ALLOWS ARBITRARY AND CAPRICIOUS APPLICATION OF THE STATUTE?

¶62. In his sentencing order, the trial judge stated:

> The Court having found that the Defendant committed an unlawful sex act invokes Sections 47-7-3(b) and 47-5-171(c) of the Mississippi Code of 1972. Accordingly, the Defendant shall not be released on parole until after he has been examined by a competent psychiatrist selected by the State [P] robation and Parole Board and found to be of normal sound mind.

¶63. A 1994 amendment to Miss. Code Ann. § 47-7-3 revised the section so as to provide that certain persons convicted of sex crimes shall not be eligible for parole. Effective June 30, 1995, §47-7-3(b) reads as follows:

> (b) Any person who shall have been convicted of a sex crime shall not be released on parole except

for a person under the age of nineteen (19) who has been convicted under Section 97-3-67.

Miss. Code Ann. § 47-7-3(b) (Supp. 1998).

¶64. Genry contends this section is void for vagueness and unconstitutional. He argues that the statute does not provide adequate notice of the definition of the words "sex crimes," thus it is not clear from the reading of the statute what crimes could be considered "sex crimes," thereby subjecting someone to its penalties.

¶65. "Statutes under constitutional attack have a presumption of validity attached to them, overcome only with a showing of unconstitutionality beyond a reasonable doubt." *Nicholson v. State*, 672 So. 2d 744, 750 (Miss. 1996) (*citing Vance v. Lincoln County Dep't of Pub. Welfare*, 582 So. 2d 414, 419 (Miss. 1991)). This Court has made clear that a strong case must be presented in arguing against the constitutionality of legislative enactments:

> With regard to the duties cast upon the assailant of a legislative enactment, the rule is fixed that a party who alleges the unconstitutionality of a statute has the burden of substantiating his claim and must overcome the strong presumption in favor of its validity. It has been said that the party who wishes to pronounce a law unconstitutional takes on himself the burden of proving this conclusion beyond all doubt, and that a party who asserts that the legislature has usurped its power or has violated the Constitution must affirmatively and clearly establish his position.

*Touart v. Johnston*, 656 So. 2d 318, 321 (Miss. 1995) (*quoting Van Slyke v. Bd. of Trustees*, 613 So. 2d 872, 880 (Miss. 1993) (*citing* 11 Am. Jur., Constitutional Laws § 132 (1937))).

¶66. Furthermore, this Court addressed the contours of the vagueness doctrine in *Meeks v. Tallahatchie County*, 513 So. 2d 563 (Miss. 1987). *Meeks* recognized that languages are inherently ambiguous and what is important is whether the ordinary person of common intelligence understands what is allowed and not allowed. *Meeks*, 513 So. 2d at 567. *Meeks* relied on the United States Supreme Court:

> [A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process.

*City of Jackson v. Lakeland Lounge of Jackson, Inc.*, 688 So. 2d 742, 747 (Miss. 1996) (*quoting Meeks*, 513 So. 2d at 566). It is hard to imagine that a person of common intelligence would not know that a conviction of **sexual** battery and **rape** constitute "sex crimes." The defendant's argument that the statute is vague because the statute does not define the term "sex crime" is ludicrous. Rather, the definition of "sex crimes" is so distinguished that the ordinary person could not attempt to say that it was not known what crimes would be categorized as "sex crimes". Further, while in a different statute, the legislature has defined what is a sexual offense. *See* Miss. Code Ann. § 45-31-3(i). Such definition includes the statutes that detail sexual battery and rape. *See id.* Furthermore, in Genry's Motion to Remand filed with this Court on December 29, 1997, counsel for Genry concedes, "The Appellant was an eighteen (18) year old man when he was arrested and since **most of the crimes that he was charged with are 'sex crimes'**, he could potentially turn seventy (70) years old while being housed with the Mississippi Department of Corrections."

¶67. The statute prohibits probation for an activity that common sensibly constitutes "sex crimes" and therefore, is not so vague as to be unconstitutional. Simply put, Genry has not proven that the statute is unconstitutionally vague or overbroad beyond a reasonable doubt and there is no merit to his argument that

he was not sufficiently aware that a conviction for sexual assault and rape would constitute "sex crimes." *Corry v. State*, 710 So. 2d 853, 860 (Miss. 1998). We find that Genry failed to overcome the statute's presumption of validity by showing its unconstitutionality beyond a reasonable doubt. Therefore, this Court finds that § 47-7-3(b) is constitutional. This assignment of error is without merit.

## IV. WHETHER GENRY IS ENTITLED TO A HEARING ON THE NEWLY DISCOVERED EVIDENCE REGARDING THE MISCONDUCT OF CATHY BROCK, SEROLOGIST WITH THE MISSISSIPPI CRIME LAB?

¶68. Genry asserts that he is entitled to hearing on the newly discovered evidence regarding the misconduct of Cathy Brock, serologist with the Mississippi Crime Lab, who testified during Genry's trial.

¶69. The verdict in this case was returned and filed on May 30, 1997. A final sentencing order was entered on June 24, 1997. Genry's Motion for a New Trial, filed on June 24, 1997, did not contain any grounds or allegations concerning Cathy Brock. The motion was overruled on June 25, 1997.

¶70. Notice of Appeal to the Court and designation of the record were filed in the Circuit Court of Harrison County on July 2, 1997. On July 2, 1997, the trial judge entered an order allowing Genry's appeal *in forma pauperis*. The last order entered by the circuit judge appearing in the official record is an order entered on August 12, 1997, directing that a pair of gold earring recovered as evidence in the cause be returned to Erika, the victim. There is nothing within the four corners of the official record about the Cathy Brock disciplinary action.

¶71. On or about December 28, 1997, long after his appeal had been perfected, Genry filed in this Court a "Motion to Remand" to the trial court for a hearing with respect to the allegations against Cathy Brock who had testified at Genry's trial. This Court entered an order on February 18, 1998, overruling this motion.

¶72. It seems that following the trial of this case and after Genry's appeal had already been perfected to this Court, counsel for Genry learned that Brock had been removed from the serology section pending the outcome of an investigation into allegations of disciplinary violations. This information was supplied in Genry's Motion to Remand. However, the motion to remand was denied by this Court, and the official record on appeal has neither been supplemented, corrected or modified. The final entry made on the general docket contained in the clerk's papers is dated July 7, 1997. In this posture, the Brock matter cannot be considered on direct appeal. The burden is on the defendant to make a proper record of the proceedings. *Jackson v. State*, 689 So. 2d 760, 764 (Miss. 1997); *Russell v. State*, 670 So. 2d 816, 822 n. 1 (Miss. 1995); *Lambert v. State*, 574 So. 2d 573, 577 (Miss. 1990). This Court "cannot decide an issue based on assertions in the briefs alone; rather, issues must be proven by the record." *Medina v. State*, 688 So. 2d 727, 732 (Miss. 1996); *Robinson v. State*, 662 So. 2d 1100, 1104 (Miss. 1995). Accordingly, the matter is not properly before this Court. This assignment of error is without merit.

## V. WHETHER THE CUMULATIVE ERRORS CREATED BY THE TRIAL COURT DEPRIVED GENRY OF A FAIR TRIAL?

¶73. This Court may reverse a conviction and sentence based upon the cumulative effect of errors that independently would not require reversal. *Jenkins v. State*, 607 So. 2d 1171, 1183-84 (Miss. 1992); *Hansen v. State*, 592 So. 2d 114, 153 (Miss. 1991). However, where "there was no reversible error in any part, so there is no reversible error to the whole." *McFee v. State*, 511 So. 2d 130, 136 (Miss. 1987).

¶74. Genry argues that even if his assignments of error do not individually constitute reversible error, the combined effect of all of the errors warrants reversal by this Court. The State's position is that no errors occurred in Coleman's trial, so there is no cumulative effect warranting reversal. They assert that Genry received a fair trial. Since Genry fails to assert any assignments of error containing actual error on the part of the trial judge in this case, this Court finds that this case should not reverse based upon cumulative error. *McFee*, 511 So. 2d at 136.

## CONCLUSION

¶75. This Court holds that the issues raised by Genry do not rise to the level requiring the case be reversed. As explained above, the trial judge neither erred in overruling Genry's motion to suppress his second station house confession nor abused his discretion in admitting into evidence the results of forensic PCR DNA testing. We further find that § 47-7-3(b) is not unconstitutionally vague, the controversy surrounding the serologist Brock is not properly before this Court as it is not included in the record on direct appeal; and there were no cumulative errors requiring reversal. As such, the convictions and relative sentences for forcible rape kidnapping, simple assault, and sexual battery are affirmed.

¶76. **COUNT I: CONVICTION OF RAPE AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. COUNT II: CONVICTION OF KIDNAPPING AND SENTENCE OF FIFTEEN (15) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. COUNT III: CONVICTION OF SIMPLE ASSAULT AND SENTENCE OF SIX (6) MONTHS IN THE CUSTODY OF THE HARRISON COUNTY JAIL AFFIRMED. COUNT V: CONVICTION OF SEXUAL BATTERY AND SENTENCE OF FIFTEEN (15) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AFFIRMED. SENTENCE IN COUNTS I, II AND V SHALL RUN CONSECUTIVELY WITH EACH OTHER FOR A TOTAL OF FIFTY (50) YEARS. SENTENCE IN COUNT III SHALL RUN CONCURRENTLY TO THE SENTENCE IN COUNT V. THE APPELLANT SHALL SERVE A TOTAL TERM OF FIFTY (50) YEARS, DAY FOR DAY.**

**PRATHER, C.J., SULLIVAN AND PITTMAN, P.JJ., BANKS, SMITH, MILLS AND WALLER, JJ., CONCUR.**

1. The State adopted Genry's statement of the facts as being fair and accurate. After fully reviewing the record, this Court agrees that it is an exceptional recitation of the prominent facts and also has adapted the statement of facts presented in Genry's brief.