# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-KA-00299-SCT

*ISSAC JERMAINE NELSON*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 01/24/2008 |
| TRIAL JUDGE: | HON. MARCUS D. GORDON |
| COURT FROM WHICH APPEALED: | SCOTT COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | EDMUND J. PHILLIPS, JR. |
| | P. SHAWN HARRIS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: W. GLENN WATTS |
| DISTRICT ATTORNEY: | MARK SHELDON DUNCAN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | COUNT I: CONVICTION AND SENTENCE AFFIRMED; COURT II: CONVICTION AFFIRMED; SENTENCE VACATED AND REMANDED FOR RESENTENCING - 04/23/2009. |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**BEFORE CARLSON, P.J., DICKINSON AND PIERCE, JJ.**

**PIERCE, JUSTICE, FOR THE COURT:**

¶1.     Issac Jermaine Nelson (Nelson) was indicted for Count I, murder of Shannon Lee

Torrence (Shannon) while engaged in the commission of a robbery in violation of Mississippi

Code Section 97-3-19(2)(e), and Count II, kidnapping of Shannon in violation of Mississippi

Code Section 97-3-53. On January 22-24, 2007, Nelson was tried in the Scott County Circuit

Court, Judge Marcus D. Gordon presiding, for the capital murder and kidnapping of

Shannon. The jury convicted Nelson of simple murder, a lesser offense, and kidnapping. Nelson was sentenced in Count I to life imprisonment for murder and in Count II to forty years for kidnapping, to run consecutively with Count I.

**FACTS**

¶2. Mary Carpenter, Shannon's mother, testified that on February 23, 2007, Shannon was at home when she left for work at 6:15 a.m. When Shannon did not call her at 12:15 p.m., as he did each day, Carpenter became concerned about her son. Carpenter then called Shannon at their home telephone number and at his cell-phone number, and called his school, Scott Central High School. The school informed her that Shannon had not attended school that day. By 3:00 p.m., Carpenter had left work and arrived home to look for Shannon. She noticed that Shannon's clothes were still in the dryer, his cell phone was on the counter, and his car was missing.

¶3. At 11:00 a.m. on February 23, Betty Lewis, a cook at Scott Central High School, saw Nelson driving a car that was later identified as belonging to Shannon near the Midway community. Lewis knew Shannon and Nelson from school. Several days after Shannon disappeared, Lewis reported to the police that she had seen Nelson driving the car.

¶4. The following Monday, on February 26, 2007, Billy Patrick, a Scott County investigator, participated in the search for Shannon. He searched a roadway near Nelson's house and noticed tire tracks going into the woods. Patrick parked his vehicle and walked into the woods, where he discovered a body with a plastic bag around the head.

¶5. Steven Crotwell, a Scott County investigator, testified that he also was investigating the missing-person report on Shannon. On February 26, Crotwell saw Shannon's body in

2

the woods with a black garbage bag secured with duct tape around his head. Nelson and Craig McBeath, another friend, both were present at Shannon's house on the day of his disappearance. Crotwell had spoken with Nelson and McBeath the previous day about the disappearance of Shannon. Following the discovery of Shannon's body on February 27, an arrest warrant was issued for Nelson.

¶6. On February 27, 2007, Crotwell and Danny Knight, an investigator with the Mississippi Bureau of Investigations, interviewed Nelson. Prior to the interview, Knight read Nelson his *Miranda* rights.[1] Nelson put his initials beside his rights and signed the waiver form. At the interview, Nelson told Crotwell that Shannon had brought him home around 11:00 a.m. on February 23, however, he had nothing to do with Shannon's death.

¶7. A few days later, Crotwell was informed that Nelson, who was in jail, wanted to speak to him. The next morning, on March 2, 2007, Crotwell and Knight met with Nelson. Prior to the interview, Knight reread Nelson his *Miranda* rights. Nelson initialed each statement of rights and signed the waiver form. Knight wrote a note at the bottom of the waiver form and Nelson signed it. The signed note stated: "I have requested to talk to [Special Agent] Danny Knight [and] Scott [County Sheriff's Office Investigator] Steven Crotwell [without] my attorney present."[2] Crotwell testified that no threats, use of violence, or promises of leniency were made to Nelson. Nelson never requested a lawyer. In addition, Crotwell stated that Nelson did not appear to be under the influence of drugs or alcohol and appeared

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] The exact wording of the note stated "I have requested to talk to S/A Danny Knight & Scott Co. S.O. Inv. Steven Crotwell w/o my attorney present."

to understand his rights. The interview was digitally recorded and transcribed, and was played for the jury. Crotwell testified that the transcription accurately reflected the digital recording of Nelson's confession. Knight's testimony corroborated Crotwell's testimony.

¶8.    Nelson confessed to the following, in part:

Nelson:    I don't know where to start. You got to ask me questions.

Knight:    Ok. Well, let's start uh the 23rd of uh, of uh February, was on Friday. And we'll, we'll go back to the, statement you that you give me and you give uh Steve [Crotwell] uh and I'll just recap it a little bit that you said that y'all had uh, uh, that uh, Puddy a guy name Puddy had taken you and uh, uh, Craig Nelson (sic) over to Shannon Torrance's house the morning of February 23rd.

Nelson:    Yes, sir.

Knight:    And y'all were over there and you uh, y'all was smoking marijuana, smoking blunts and uh and just, just hanging out.

. . .

Nelson:    Well when we went over to Shannon's house like I said we was just hanging out smoking weed, watching TV doing all that. But it came a time when I got mad for some reason. I still don't know to this day why I got mad at Shannon. But I did. And when Shannon came out the bathroom I started choking him until he got red in the face, or whatever. But I ain't kill him though. I just kept choking him man. I don't know why. And then when I let go he was still alive but Craig was like "man you can't do this and don't go all the way with it." So he grabbed him and started choking him until he was dead. (cries) I'm sorry.

. . .

Nelson:    Like I said though man I don't even know why I did it he didn't do nothing to me. He didn't make me mad. It's just something got in me man that's why I started choking him for no reason. And then when I was choking him he was begging me please to

4

stop. And that's when I let him go. And Craig told me "man you done did this and you ain't goan finish it[.]" He was laying on the floor. He was gasping for air trying to get air. And then Craig went ahead and he choked him until he died. We went and got garbage bags. I gave them to Craig I went outside on the porch. I guess, guess Craig he tied him up or whatever with the bags and put the tape around his face. We put him in the trunk I took him out to Midway we drove him out to Midway in his car. And we threw him in the woods.

¶9. Both Nelson and McBeath claimed that they were scared that Shannon was going to tell someone what had occurred. McBeath then choked Shannon and punched him in the head to try to knock Shannon unconscious. After this, Nelson stated that "Shannon was just laying there he weren't moving or nothing. So we just knew he was dead." Nevertheless, Nelson went to find garbage bags and tape on McBeath's instructions. According to Nelson, McBeath placed the garbage bag around Shannon's face and Nelson tied the duct tape around Shannon's face. McBeath got a sheet and put it around Shannon's body. Nelson and McBeath then put Shannon in the trunk of the car and dumped the body.

¶10. Nelson drove Shannon's car to East Central Junior College and parked the car. Soon thereafter, McBeath remembered that the duct tape was in the trunk of the car and he asked Nelson for the keys to Shannon's car. McBeath said he never retrieved the tape, because there were too many people near the car and he did not want anyone to see him get the tape.

¶11. Gerald Greer, a Scott County investigator at the time of the murder, recovered Shannon's vehicle from East Central Junior College. Stacy Smith, a forensic scientist with the Mississippi Bureau of Investigation, testified that a blue blanket and duct tape were among the items recovered from Shannon's vehicle.

5

¶12. Dr. Steven Hayne, the State's pathologist, testified that the combination of strangulation and suffocation caused Shannon's death. However, Dr. Hayne stated that "the strangulation was incomplete and suffocation was the terminal event." Dr. Hayne determined that Shannon was strangled, but that he had died from the subsequent suffocation caused by the obstruction around his mouth and nose by the plastic bag and tape. Dr. Hayne also stated that a person could get a small amount of air through the plastic bag. Nonetheless, Dr. Hayne testified that he did not think that a person would have a significant air flow going in and out of the plastic bag. In his opinion, a person could survive only a few minutes under those circumstances.

¶13. During his testimony, Dr. Hayne also stated that Shannon had linear abrasions or scrapes and bruises on the skin on his back. In Dr. Hayne's opinion, the linear scrapes on Shannon's back were made while he was alive. Dr. Hayne based his opinion on the fact that there was bleeding underneath the surface of the skin which indicated that Shannon "was pumping blood into the injured areas." Dr. Hayne explained that a deceased victim would have pale linear marks with no bruises. Dr. Hayne also testified that the long, straight, linear marks were consistent with a dragging or sliding motion.

## DISCUSSION

### I.    Whether the Trial Court Sentence for Kidnapping Exceeded the Statutory Maximum Penalty.

¶14. Nelson argues that the trial court imposed a sentence that exceeded the statutory maximum penalty for kidnapping. The jury found Nelson guilty of kidnapping. However, the jury did not impose a life sentence.

6

¶15.    Mississippi Code Annotated Section 97-3-53 states:

Any person who, without lawful authority and with or without intent to secretly confine, shall forcibly seize and confine any other person, or shall inveigle or kidnap any other person with intent to cause such person to be confined or imprisoned against his or her will, or without lawful authority shall forcibly seize, inveigle or kidnap any child under the age of sixteen (16) years against the will of the parents or guardian or person having the lawful custody of the child, upon conviction shall be imprisoned for life in the custody of the Department of Corrections if the punishment is so fixed by the jury in its verdict. *If the jury fails to agree on fixing the penalty at imprisonment for life, the court shall fix the penalty at not less than one (1) year nor more than thirty (30) years in the custody of the Department of Corrections.*

This section shall not be held to repeal, modify or amend any other criminal statute of this state.

Miss. Code Ann. § 97-3-53 (Rev. 2006) (emphasis added).

¶16.    The record reflects that Judge Gordon based the forty-year kidnapping sentence on a mortality table which indicated the expected life span for someone Nelson's age. He stated that "I must sentence you to a term of years less than your reasonable life expectancy." Nelson made no objection to his sentence. Further, Nelson failed to raise this issue in his motion for new trial.

¶17.    Notwithstanding Nelson's failure to object or raise the sentencing issue in his motion for new trial, the language of the statute states that "If the jury fails to agree on fixing the penalty at imprisonment for life, the court shall fix the penalty at not less than one (1) year nor more than thirty (30) years in the custody of the Department of Corrections." Miss. Code Ann. § 97-3-53 (Rev. 2006). The jury did not impose a life sentence. Therefore, the statute permitted the trial court to impose a sentence of not less than one year nor more than thirty years. The trial court imposed a sentence of *forty years,* which exceeded the statutory

7

maximum. We find that Nelson should be resentenced in accordance with Mississippi Code Section 97-3-53 on his kidnapping conviction only.

## II. Voir Dire of Dr. Hayne.

¶18. Nelson argues that the trial court erred by refusing to permit him to voir dire Dr. Hayne, the State's pathologist. The State argues that the trial court did not abuse its discretion by accepting Dr. Hayne as an expert. Further, the State argues that Nelson chose not to voir dire Dr. Hayne on his opinion about the physical findings, and Nelson had an opportunity to cross-examine Dr. Hayne on the cause of death. After a review of the record, this Court agrees with the State.

¶19. Nelson first objected to Dr. Hayne's qualifications after Dr. Hayne testified about his educational and work background. His objection related to whether Dr. Hayne was qualified to give certain opinions based on the specially concurring opinion authored by former Justice Oliver Diaz in *Edmonds v. State*, 955 So. 2d 787 (Miss. 2007). Since Dr. Hayne had yet to provide his opinion in Nelson's case, the trial court overruled the objection. The following exchange occurred:

| By [Defense]: | Well, Your Honor, I understand he's testified to [his education and experience], but I also understand he has been denied – uh – to give certain opinions in certain cases, and I believe most recently in *Edmonds v. State*. |
|---|---|
| By the Court: | I'm familiar with that case. I'm familiar with Judge Diaz, too. |
| By [Defense]: | Yes, sir. |
| By the Court: | And I'm familiar with what [Justice Diaz] says and – and the law is that that does not disqualify a person from |

being – giving an expert opinion. It only goes to his credibility.

By [Defense]: I understand that.

By the Court: Well, what do you want to go at?

By [Defense]: Your Honor, I would like to –

By the Court: He's not given any opinion in this – in this case yet for you to cross-examine him on, and until he starts giving an opinion, you're overruled.

¶20. After Dr. Hayne testified about his physical findings concerning the victim, the trial court gave Nelson an opportunity to voir dire Dr. Hayne on his qualifications. However, defense counsel declined to voir dire him at that time. Dr. Hayne then testified about the cause of death. Dr. Hayne ultimately determined that in his opinion, Shannon was strangled, however, he died because of suffocation by the bag and tape around his head.

¶21. Later, Nelson again objected to Dr. Hayne's testimony. When the jury was excused, the trial court inquired whether defense counsel wanted to voir dire Dr. Hayne about his qualifications. Defense counsel responded and stated:

No, sir. I'm voir direing – what I want to discuss was – it's based on the autopsy report we have been provided that we anticipate Doctor Hayne's testimony is going to be the drag marks indicate that he was alive when he was dragged from the house, which would be evidence of kidnapping.

After more discussion, the trial court asked defense counsel what he proposed to do. Defense counsel stated, "Well, what procedure I'm suggesting is for them to finish eliciting the testimony from him regarding what that opinion is."

¶22. Thereafter, the jury returned and the State continued questioning Dr. Hayne. Dr. Hayne testified about the linear, straight-line abrasions on the victim's body. Dr. Hayne

9

testified that, in his opinion, the contusions and bruises on the victim's back were made while Shannon was alive. In addition, Dr. Hayne testified that the long, linear marks on Shannon's body were consistent with dragging or sliding the body.

¶23. Defense counsel cross-examined Dr. Hayne about the cause of death. Dr. Hayne explained the medical differences between strangulation and suffocation. In addition, Dr. Hayne testified that the bag around Shannon's face was relatively tightly taped, however, a small amount of air could have entered the bag. When asked whether a person would survive more than a "couple minutes" after the bag was placed over his face, Dr. Hayne testified that a person could survive "[m]aybe a minute longer – couple minutes longer, but certainly, it's a very short period of time, counselor." Counsel also briefly questioned Dr. Hayne about photographs which he stated showed evidence of defensive wounds on the victim.

¶24. Following cross-examination, the trial court again gave Nelson the opportunity to voir dire Dr. Hayne. However, defense counsel decided that he no longer wanted to pursue his former request to question Dr. Hayne.

¶25. In *Edmonds*, this Court reversed and remanded Edmonds's murder conviction. *Edmonds*, 955 So. 2d at 799. Dr. Hayne testified to a two-shooter theory wherein he stated that it was more than likely that two people fired the shot that killed the victim, Joey Fulgham. *Edmonds*, 955 So. 2d at 791. The majority opinion determined that Dr. Hayne was "qualified to proffer expert opinions in forensic pathology" however "a court should not give such an expert carte blanche to proffer any opinion he chooses." *Id*. at 792. The majority held, in part, that Dr. Hayne's two-shooter theory was not admissible. *Id*.

10

¶26.    Justice Diaz's specially concurring opinion criticized Dr. Hayne on two issues.  First, the separate opinion questioned Dr. Hayne's certifications.  *Edmonds*, 955 So. 2d at 802. (Diaz, P.J., specially concurring).  Second, the separate opinion questioned the number of autopsies performed by Dr. Hayne.  *Id*.  While the specially concurring opinion questioned Dr. Hayne's credentials, the majority held that "Dr. Hayne is qualified to proffer expert opinions in forensic pathology."  *Id*. at 792.

¶27.    We find that the trial court did not err by not allowing Nelson to voir dire Dr. Hayne. As the record reflects, the trial court initially denied Nelson's objection to Dr. Hayne's qualifications because he had not yet testified to his opinion in the case.  Thereafter, the trial court gave Nelson numerous opportunities to voir dire Dr. Hayne on his opinions.  However, Nelson declined to voir dire Dr. Hayne on a few occasions, and following cross-examination of the doctor, Nelson withdrew his request.  Accordingly, this assignment of error is without merit.

### III.    Whether the Evidence Was Sufficient to Support the Convictions.

¶28.    Nelson challenges both the sufficiency of the evidence and the weight of the evidence. In his statement of the issue, Nelson challenges both counts of the indictment, however, he ultimately requests relief from the kidnapping conviction.  The Court will address the sufficiency of the evidence and the weight of the evidence for both the murder conviction and the kidnapping conviction.  Nelson also argues that the kidnapping occurred as part of the murder and, therefore, double jeopardy bars prosecution for both murder and kidnapping. Nelson argues that the kidnapping conviction should be overturned because the alleged

11

kidnapping occurred after the victim was deceased and therefore not susceptible to being kidnapped.

### A. Sufficiency of the Evidence.

¶29.  Motions for a directed verdict and judgment notwithstanding the verdict challenge the legal sufficiency of the evidence, and the standard of review for a directed verdict and judgment notwithstanding the verdict are identical. *Croft v. State*, 992 So. 2d 1151, 1157 (Miss. 2008) (citations omitted).  In *Jones v. State*, 904 So. 2d 149, 153-154 (Miss. 2005), this Court stated:

> To determine whether the evidence is sufficient to sustain a conviction in the face of a motion for directed verdict or for judgment notwithstanding the verdict, the critical inquiry is whether the evidence shows "beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction." *Carr v. State*, 208 So. 2d 886, 889 (Miss. 1968).  The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).

*Jones*, 904 So. 2d at 153-154.  The jury determines the weight and credibility of witness testimony. *Moore v. State*, 933 So. 2d 910, 922 (Miss. 2006).

¶30.  Nelson was indicted for capital murder pursuant to Mississippi Code Section 97-3-19(2)(e) based on alleged murder and the underlying crime of robbery.  Nelson also was indicted for the crime of kidnapping pursuant to Mississippi Code Section 97-3-53.

¶31.  After the State rested, Nelson argued his motion for directed verdict.  The trial court heard arguments from both Nelson and the State.  The trial court denied that motion and stated:

12

We have two crimes charged, that of capital murder, we have that of kidnapping. I, having heard the testimony of Doctor Haynes [sic], having viewed the exhibits that has been offered into evidence, and having heard the statement of the defendant, find certainly that there is evidence for the jury to accept that the victim would – had been kidnapped. I asked the question, and I still cannot conceive of any reason that the two defendants would have to place a garbage bag over a man's head and use duct tape to seal it off if they believed him to be dead. To me that's an indication that they believed that he was alive and if they transported him from that house as testified to, then that is the crime of kidnapping. With the crime of robbery, I – I at one time could recall certain cases that would be relevant to this issue, but I – I know there is such a case where – a capital murder case, and I think it happened up in north Mississippi back in the 70's, where there was a killing and then the defendant took the victim's car and left in it, and the Supreme Court considered that as a crime of robbery and upheld the death penalty. In this case here, according to the testimony or the statement of the defendant, after the – uh – killing there, that they left with the victim in the trunk of the car, disposed of his body, carried the car to East Central Community College in an effort to conceal the car. I think those are certain issues that the jury can resolve. I think the State has made out a prima facie case of guilt. Your motion's overruled.

¶32. Nelson chose to rest his case without presenting any evidence. The jury returned a verdict and convicted Nelson of the lesser offense of simple murder, not capital murder. The jury also convicted Nelson of kidnapping Shannon. Following the jury verdicts, Nelson filed a motion for new trial, which the trial court denied.

¶33. Considering the evidence in the light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt that Nelson committed the essential elements of the murder and kidnapping. In regard to the murder, Nelson confessed to choking Shannon. When Shannon begged Nelson to stop choking him, McBeath began to choke Shannon. At McBeath's request, Nelson found a plastic garbage bag and duct tape. McBeath placed the bag around Shannon's face and Nelson taped the bag around Shannon's head. Dr. Hayne testified that the causes of Shannon's death were twofold, strangulation and suffocation, and

13

that the suffocation was the "terminal event" that caused Shannon's death. In addition, Dr. Hayne stated that Shannon had suffered linear abrasions and bruises on his back. In his opinion, Shannon was alive when these marks were made on his back, because the bleeding that occurred under the skin indicated that blood still was pumping into the injured area.

¶34. As for the kidnapping, the evidence presented to the jury was sufficient to support a conviction of kidnapping. Nelson confessed to choking Shannon and then taping the duct tape around Shannon's head. In his confession, Nelson stated that after McBeath choked Shannon, he "just knew" that Shannon was dead. Despite Nelson's claim that he "just knew" that Shannon was dead, Nelson complied with McBeath's request and found a garbage bag and duct tape. McBeath placed the bag on Shannon's face, and Nelson stated that he wrapped the duct tape around Shannon's head. Nelson confessed to removing Shannon from his home, with the help of McBeath, placing Shannon in the trunk of Shannon's car, and dumping Shannon's body in the woods.

¶35. Dr. Hayne testified that the suffocation was the terminal event that ended Shannon's life. It was determined that a small amount of air could flow through a plastic bag. However, Dr. Hayne testified that a person could survive only a short period of time under those circumstances. Furthermore, Dr. Hayne testified that Shannon had sustained linear scrapes on his back which signified a dragging or sliding movement. The scrapes and bruises also signified that Shannon was alive at the time he sustained the injuries based on the type of bleeding. Dr. Hayne explained that, in contrast, a deceased victim would have pale linear marks with no bruises. Accordingly, we find that there was sufficient evidence for the jury to convict Nelson of murder and kidnapping.

14

¶36. Furthermore, Nelson's contention that the kidnapping occurred as part of the murder and therefore, double jeopardy bars the prosecution of murder and kidnapping, is without merit. Murder and kidnapping have separate statutory elements, requiring different facts.

¶37. In *Bannister v. State*, 731 So. 2d 583, 586 (Miss. 1999), this Court held:

> Although the state may freely define crimes and assign punishments, it is not allowed to punish a defendant for a crime containing elements which are completely enveloped by an offense for which a defendant was previously convicted. *See Blockburger v. United States*, 284 U.S. 299, 76 L. Ed. 306, 52 S. Ct. 180 (1932). "If an individual is charged with two offenses, and all the elements of one are included within and are part of a second greater offense, *Blockburger* intervenes. It charges that we compare statutory offenses, as indicated, and see whether each requires proof of a fact which the other does not." *Meeks v. State*, 604 So. 2d 748, 751 (Miss. 1992). "Even though there may be a substantial overlap in the proof supporting the convictions of the different crimes, the *Blockburger* test is met where each offense requires proof of an element not necessary to the other." *Holly v. State*, 671 So. 2d 32, 44 (Miss. 1996) (citing *Brock v. State*, 530 So. 2d 146, 150 (Miss. 1988)).

*Bannister*, 731 So. 2d at 586.

¶38. Nelson was charged with capital murder pursuant to Mississippi Code Annotated Section 97-3-19(2)(e) for murder and the underlying crime of robbery, which provides:

> (2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
> . . . .
>
>> (e) When done with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, kidnapping, arson, robbery, sexual battery, unnatural intercourse with any child under the age of twelve (12), or nonconsensual unnatural intercourse with mankind, or in any attempt to commit such felonies . . . .

Miss. Code Ann. § 97-3-19(2)(e) (Rev. 2006).

¶39. Nelson also was indicted for the crime of kidnapping pursuant to Mississippi Code Section 97-3-53, which provides, in part:

> Any person who, without lawful authority and with or without intent to secretly confine, shall forcibly seize and confine any other person, or shall inveigle or kidnap any other person with intent to cause such person to be confined or imprisoned against his or her will, or without lawful authority shall forcibly seize, inveigle or kidnap any child under the age of sixteen (16) years against the will of the parents or guardian or person having the lawful custody of the child . . . .

Miss. Code Ann. § 97-3-53 (Rev. 2006).

¶40. The crimes of capital murder and kidnapping each require proof of an element not necessary to the other. *See Bannister*, 731 So. 2d at 586 (quoting *Holly*, 671 So. 2d at 44) (*Blockbuster* is met when each crime "requires proof of an element not necessary to the other"). Accordingly, this issue is without merit.

### B. Weight of the Evidence.

¶41. Following the jury verdicts, Nelson filed a motion for new trial, which the trial court denied. In *Jones*, this Court also addressed the weight of the evidence and stated:

¶42. When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. *Herring v. State*, 691 So. 2d 948, 957 (Miss. 1997). The evidence should be weighed in the light most favorable to the verdict. *Id*.

*Jones*, 904 So. 2d at 154.

¶43. Without restating the facts previously presented, and viewing the evidence in the light most favorable to the verdict, we cannot say that the verdicts convicting Nelson of murder and kidnapping are so contrary to the overwhelming weight of the evidence that to allow them to

16

stand would sanction an unconscionable injustice. Nelson confessed to choking Shannon, placing a plastic bag over his head, and securing duct tape around Shannon's head to keep the bag in place notwithstanding his claim that he already believed that Shannon had died after McBeath choked him. Dr. Hayne testified that the bleeding of the skin under the linear drag marks and the bruises on Shannon's body signified that Shannon was alive at the time he sustained those injuries. He also stated that these linear marks were consistent with dragging.

¶44. The jury heard the conflicting testimony of Nelson and Dr. Hayne. Nelson's confession indicated that Nelson believed that McBeath had choked Shannon to death. In addition, Nelson stated in his confession and that he "just knew" that Shannon was dead prior to securing the duct tape around Shannon's head. The jury also heard Dr. Hayne's opinion on Shannon's cause of death and his opinion on whether Shannon had been alive at the time he sustained the linear abrasions consistent with dragging. After hearing all the evidence, including the conflicting evidence, the jury convicted Nelson of murder and kidnapping. Accordingly, we find that this issue is without merit.

### IV. Whether the Trial Court Erred by Admitting Nelson's Confession into Evidence.

¶45. Nelson argues that the trial court erred by admitting his confession into evidence. He claims that his right to counsel attached at the time of his initial appearance. Nelson confessed to law enforcement officials two days after his right to counsel attached and without counsel present. The State argues that, even though counsel was not appointed or present at the time of Nelson's statements, he gave his statements after voluntarily and intelligently waiving his *Miranda* rights. The evidence also shows that Nelson initiated contact with law

17

enforcement officials before his second interview. Therefore, the State contends that the trial court did not err by admitting Nelson's confession.

¶46. At the suppression hearing, Crotwell, the Scott County investigator, testified that Nelson was arrested on February 27, 2007. Crotwell stated that he and Knight, an investigator, spoke to Nelson on February 27 after Nelson was read, signed, and waived his *Miranda* rights. Crotwell stated that Nelson told them that he saw Shannon that day, however, he had nothing to do with Shannon's death. Nelson argues that he had an initial appearance on February 28, 2007.[3]

¶47. Gerald Major, a former jailer at the Scott County Detention Center, testified that, about March 1, 2007, while Nelson was outside his cell on "yard call," he informed Major that he would like to speak to Crotwell. Major relayed that message through the chain of command. Crotwell testified that a few days after the initial, February 27 interview, Nelson asked to speak to him. On March 2, 2007, Crotwell and Knight spoke to Nelson again. Prior to the March 2 conversation, Knight reread Nelson his *Miranda* rights, and Nelson again signed the waiver form. In addition, Knight hand-wrote and Nelson signed a note at the bottom of the form, in which Nelson requested to speak to the Scott County investigators.

¶48. Crotwell stated that Nelson's March 2 statements were recorded on a compact disc. According to Crotwell, Nelson stated that he and McBeath were at Shannon's house. Nelson told Crotwell that he did not know why he did it, however, he began to choke Shannon when

---

[3] Nelson claims that his initial appearance was on February 28, 2007. The record does not reflect any documentation to this effect. The State, however, does not contest it and, in fact, makes no argument about the date of the initial appearance.

18

Shannon left the bathroom. Nelson choked Shannon until he was unconscious, loaded Shannon into the trunk of Shannon's car, dumped Shannon's body at Midway, and drove the car to East Central Junior College.

¶49. The prosecution then played the compact disc for the trial court. Agent Knight also testified at the suppression hearing. Knight stated that on February 27, 2007, he read the *Miranda* rights to Nelson. Nelson placed his initials beside each section of the *Miranda* rights form and signed the waiver at the bottom of the page. At that time, Nelson stated that he had stopped by Shannon's house, that they had decided to smoke some marijuana and not go to school. Nelson stated that he then drove Shannon to Brandon.

¶50. The rest of Knight's testimony corroborated Crotwell's testimony. The most critical portion of Knight's testimony corroborated that Nelson had asked to speak to Crotwell; Knight reread Nelson his *Miranda* rights on March 2, 2007, prior to any statements by Nelson; and Nelson confessed to the crimes.

¶51. After these three witnesses testified, Nelson objected to his confession being admitted into evidence because it was not a statement of his free admission, free will, or free testimony, and he was under duress at the time of the statement. The trial court determined that Nelson knowingly, intelligently, and voluntarily had waived his *Miranda* rights without any coercion, intimidation, or promises of rewards. The trial court stated:

> The Court first having heard the statement must consider the *Miranda* warnings that was given the defendant on the two occasions to which testimony has been submitted. Uh – pursuant to the *Miranda* case, the *State of Arizona vs. Miranda*, there must be a ruling regarding the admissibility of the statement as to whether or not he was properly informed of his rights, and that with knowledge of his constitutional rights he then knowingly and freely and voluntarily waived those rights and made a statement, not the result of coercion,

19

intimidation, pressure, promises of hope of reward. I've heard the testimony – I've – I've reviewed those *Miranda* warnings. I've heard the testimony of the officers. I am of the opinion that the defendants was given the warning as required by law, that he understood his rights, with knowledge of this rights he's waived them, the waiver was free and voluntary and understandingly made, and the objection to the admissibility of the statements, on both occasions, are overruled.

¶52. This Court in *Haynes v. State*, 934 So. 2d 983, 988 (Miss. 2006), has held that "[w]hether a confession is admissible is a fact-finding function for the trial court, and its decision will not be overturned unless the trial court applied an incorrect legal standard, committed manifest error, or made a decision against the overwhelming weight of the evidence." *Haynes*, 934 So. 2d at 988; *see also Moore v. State*, 933 So. 2d 910, 918 (Miss. 2006); *Martin v. State*, 871 So. 2d 693, 701 (Miss. 2004).

> For a confession to be admissible, it must have been given voluntarily and not given as a result of promises, threats or inducements." *Richardson v. State*, 722 So. 2d 481, 487 (Miss. 1998) (citing *Morgan v. State*, 681 So. 2d 82, 86 (Miss. 1996); *Chase v. State*, 645 So. 2d 829, 837-38 (Miss. 1994); *Layne v. State*, 542 So. 2d 237, 240 (Miss. 1989)). In determining whether a statement is voluntary, the trial judge must first determine whether the accused, prior to the confession, understood the content and substance of the *Miranda* warning and the nature of the charges of which he was accused. *Neal v. State*, 451 So. 2d 743, 755 (Miss. 1984).

*Martin v. State*, 871 So. 2d 693, 701 (Miss. 2004).

¶53. In *Genry v. State*, 735 So. 2d 186, 195 (Miss. 1999), this Court determined whether the defendant's Sixth Amendment right to counsel was violated when he gave an incriminating statement. Like Nelson, Genry relied upon *Michigan v. Jackson*, 475 U.S. 625, 106 S. Ct. 1404, 89 L. Ed. 2d 631 (1986). Genry argued that he gave his first statement the day after the assault; however, he said his second statement violated the Sixth Amendment since police obtained it after he had been appointed counsel. *Genry*, 735 So. 2d at 195. "A

20

defendant's Sixth Amendment right to counsel attaches upon the initiation of adversary proceedings." *Id*. (citing *Michigan*, 475 U.S. at 635).

¶54.    This Court analyzed whether Genry's Sixth Amendment rights were violated based on a number of facts.  Prior to and during questioning, Genry never requested the presence of counsel.  *Genry*, 735 So. 2d at 196.  This Court held that Genry's failure to "assert or invoke his right to silence or in any way assert his Sixth Amendment right to counsel, his argument on this point is without merit."  *Id*. (citing *Wilcher v. State*, 697 So. 2d 1087, 1097 (Miss. 1997)).    This Court further stated:

> [T]he evidence indicates that, upon being given his Fifth Amendment/*Miranda* warnings, Genry waived his right to counsel before each inculpatory statement was given.  As a general rule, a defendant may waive his Sixth Amendment right to counsel when he waives his Fifth Amendment rights.  *Crawford v. State*, 716 So. 2d 1028, 1038 (Miss. 1998) (citing *Wilcher v. State*, 697 So. 2d 1087, 1096 (Miss. 1997)).  Therefore, this assignment of error is without merit.

*Genry*, 735 So. 2d at 196.

¶55.    Significantly, Genry initiated contact with law enforcement. *Genry*, 735 So. 2d at 196. This Court held that "[o]nce the right to counsel has attached, and the accused asserts the right, he is protected from further police-initiated interrogation. Even if the accused has procured an attorney, the accused may still waive the right to have the lawyer present during any police questioning."  *Id*. (quoting *Mettetal v. State*, 602 So. 2d 864 (Miss. 1992)). However, in *Genry*, this Court further addressed circumstances in which a defendant decides to initiate contact with law enforcement after his or her Sixth Amendment rights are in place. This Court stated:

> Nothing in the Sixth Amendment prevents a suspect charged with
> a crime and represented by counsel from voluntarily choosing, on

21

> his own, to speak with police in the absence of an attorney. Although a defendant may sometimes later regret his decision to speak with police, the Sixth Amendment does not disable a criminal defendant from exercising his free will.

> *Mettetal*, 602 So. 2d at 868 (citations omitted). *See also* ***Hunter v. State***, 684 So. 2d 625, 632 (Miss. 1996) ("The law is well established that an accused person can waive his right to counsel by initiating conversation with law enforcement."). This further supports the State's contention that this issue is without merit.

*Id*. *See also* ***Brewer v. William***, 430 U.S. 387, 405-06, 97 S. Ct. 1232, 1243, 51 L. Ed. 2d 424, 441 (1977) (under the circumstances of the case, the Supreme Court held that Williams did not waive his rights under the Sixth and Fourteenth Amendments).

¶56. The factual circumstances here are similar to those in ***Genry***. After his initial appearance, Nelson voluntarily asked to speak to Crotwell. Prior to making his confession, Nelson was reread his ***Miranda*** warning. He initialed each portion of his rights and signed underneath the waiver of rights, which stated:

> I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Furthermore, Knight wrote and Nelson signed a statement at the bottom of his waiver form that stated "I have requested to talk to [Special Agent] Danny Knight [and] Scott [County Sheriff's Office Investigator] Steven Crotwell [without] my attorney present." Both Crotwell and Knight testified that Nelson was not promised a reward or leniency, nor was he threatened with violence. Nelson never asked for a lawyer. Also, Crotwell and Knight testified that

Nelson did not appear to be under the influence of drugs or alcohol and appeared to know what he was doing.

¶57. The trial court did not err by admitting Nelson's March 2, 2007, confession. Law enforcement officials advised Nelson his *Miranda* rights. Nelson initialed the rights and signed the waiver form. Nelson also signed a note stating that he had initiated contact with law enforcement officials. Both law enforcement officials testified that Nelson never asked for a lawyer, that no promises or threats were made to Nelson, and that Nelson appeared to know what he was doing. Accordingly, this Court finds that this assignment of error is without merit.

## CONCLUSION

¶58. For the foregoing reasons, the jury convictions of murder and kidnapping by the Circuit Court of Scott County are affirmed. However, this Court reverses and remands the sentence of forty years for the kidnapping conviction for resentencing within the statutory guidelines.

¶59. **COUNT I: CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. COUNT II: CONVICTION OF KIDNAPPING, AFFIRMED. SENTENCE OF FORTY (40) YEARS VACATED AND REMANDED TO THE CIRCUIT COURT OF SCOTT COUNTY FOR RESENTENCING.**

**WALLER, C.J., CARLSON, P.J., DICKINSON, RANDOLPH, LAMAR, AND CHANDLER, JJ., CONCUR. GRAVES, P.J., CONCURS IN RESULT ONLY. KITCHEN, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION.**

23

**KITCHENS, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶60.    I concur with the majority's decision to affirm Nelson's conviction for the crime of murder, but I part company with my learned colleagues in their affirmance of Nelson's conviction for kidnapping, which I find to be barred by our constitutional prohibition against double jeopardy.

¶61.    This is a murder case and nothing more. Whichever of Nelson's actions can fairly be said to have given rise to kidnapping charges clearly were subsumed within his murderous conduct and cannot, consistent with the protections of the Fifth Amendment to the United States Constitution and Article 3, Section 22, of the Mississippi Constitution, form the basis of a prosecution for a separate offense.

¶62.    Section 97-3-19 of the Mississippi Code requires that prosecutors show both an act of killing and "deliberate design to effect the death" in order to garner a conviction for murder. Miss. Code Ann. § 97-3-19 (Rev. 2006). By comparison, Mississippi Code Section 97-3-53 defines kidnapping as an intentional, forcible seizure and confinement. Miss. Code Ann. § 97-3-53 (Rev. 2006). Obviously, these two statutes are facially distinct, and therefore, I readily concede that a defendant may be guilty of both kidnapping and murder, as it is elementary that "[a] single act may be an offense against two statutes . . . ." ***Blockburger v. United States***, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

¶63.    But the facts set before us provide no basis for such a conclusion. The seizure and confinement in this case were merely incidental to the act of murder, namely, taping a bag around Shannon Torrence's head, dragging his dying body to the car, and driving him to the

24

woods where the body was dumped. This unbroken course of conduct by Nelson, which brought about the death of his victim, constituted the dastardly act of murder for which he properly was convicted. But no more can it form the basis for a valid kidnapping charge than can the act of a gunman who backs his victim into a corner before shooting him, or the act of a strangler who seizes his quarry's throat until the poor soul breathes his last breath. We would not hold that acts such as these, incidental to the very act of murder itself, are also acts of kidnapping. Neither, therefore, should we hold that Nelson's despicable and malicious conduct constituted any crime but murder.

¶64.    Indeed, the crime of murder necessarily includes some degree of seizure, no matter how brief or how slight. If we declare such incidental seizure is a fact sufficient to give rise to a separate charge of kidnapping, then the practical effect would be that every act of murder is capital murder, with kidnapping as the underlying felony. If readings of the kidnapping and murder statutes evince a legislative intent to permit such a result, then that interpretation is lost on me.

¶65.    More fundamentally, though, our double-jeopardy jurisprudence recognizes that "when the impulse is single, but one [charge] lies, no matter how long the action may continue. If successive impulses are separately given, even though all unite in swelling a common stream of action, separate [charge]s lie." *Id.* at 302. No such separation of impulses can reasonably be gleaned from the facts of this tragic case; and to the extent that this particular murderous act suggests the propriety of a separate charge of kidnapping, such a suggestion lies in conflict with the state and federal constitutional guarantees of protection from double jeopardy.

25

¶66. Accordingly, I would affirm the conviction for murder but reverse and render on the charge of kidnapping. Therefore, I concur in part and dissent in part.