ISHEE, J.,
for the Court:
¶ 1. John Jackson was convicted in the Forrest County Circuit Court in December 2011 of three counts of shooting into an *60 occupied dwelling. He was sentenced to ten years in the custody of the Mississippi Department of Corrections (MDOC) for each count, with the sentences to run consecutively. Aggrieved, Jackson now appeals. Finding no error, we affirm.
STATEMENT OF FACTS
. ¶ 2. In July 2010, Jackson, a divorced father of two young children, was working as a barback at the Remington Hunt Club in Hattiesburg, Mississippi. On the evening of July 25, 2010, Jackson was working at the club when Kelvin Gholar, a patron at the club who prefers the nickname “Doom,” threw a drink at a female but missed and hit Jackson in the face. Jackson, who had previously worked as a security guard at the club, detained Gholar and had him removed from the club.
¶ 3. Shortly thereafter, club employees told Jackson that his 1998 baby blue and navy Ford Crown Victoria had been severely vandalized. Upon hearing the news, Jackson went outside to look at his vehicle and saw several men running from the vehicle. Although he chased them, he could not catch them and did not see their faces.
¶ 4. At 3:48 a.m. on July 26, 2010, Jackson clocked out of work. He went to the parking lot to further inspect his vehicle. He discovered that the windshield was completely shattered, the passenger window was cracked, the tires were slashed, and the exterior of the vehicle had been keyed. He noticed that a police officer was standing at the end of the parking lot directing the traffic exiting the club. Jackson testified that he drove the vehicle up to the police officer to ask if the officer had seen any of the vandalism. The officer responded that he had not seen anything, so Jackson drove the vehicle back to the front of the club.
¶ 5. Jackson then went inside and told the club’s owner, William Norris, what had occurred. After discussing the incident with Jackson, Norris pulled up the surveillance videos to investigate. Norris, along with numerous other witnesses, testified on Jackson’s behalf at trial. Norris stated that the club has thirty-two cameras, and it took the men approximately twenty minutes to go through the footage, which produced no results due to the angle of the camera located near Jackson’s vehicle. Norris was unsure of the exact time of Jackson’s arrival to his office, but knew that Jackson had already clocked out when he came to him about the incident. Norris also stated that Jackson was present for longer than twenty minutes since they discussed the incident prior to reviewing the surveillance footage. By Norris’s estimation, Jackson would have left his office sometime after 4:00 a.m.
¶ 6. Coworkers present in the parking lot with Jackson testified that they observed Jackson come out of the club after reviewing the surveillance footage. Several of Jackson’s coworkers discussed the incident briefly with him before leaving the parking lot. The witnesses stated that Jackson left the parking lot at or after 4:15 a.m.
¶ 7. Jackson testified that after leaving the parking lot around 4:15 or 4:20, he slowly drove to a nearby gas station to put air in his damaged tires. He stated that he then drove to his house and went to sleep.
¶ 8. Meanwhile, at 4:24 a.m., a 911 call was received reporting shots fired at the Bonhomie Apartments in Hattiesburg. Kim Bolton and Tina Ruffin testified on behalf of the State regarding the shooting. Bolton knew Jackson because she had been removed from the club by Jackson on several prior occasions when he was working as a security guard for the club. Bol *61 ton testified that Jackson arrived at the apartment complex in a silver or gray Dodge Charger with several other men in the vehicle. She claimed that Jackson started asking for directions to Gholar’s apartment within the complex. Bolton testified that she ran to Gholar’s apartment to warn him of the impending trouble. Ruf-fin, who stated she was nearby, accompanied Bolton to Gholar’s apartment.
¶ 9. Bolton and Ruffin claimed that they reached Gholar’s apartment immediately prior to the shooting. Gholar, Bolton, and Ruffin claimed that they then ran from the shooters when the shooting began. Bolton identified Jackson as one of the shooters. Ruffin also identified Jackson in a photographic lineup as one of the shooters. However, Ruffin referred to Jackson as “the short one.” Jackson is six feet, four inches tall.
¶ 10. The Hattiesburg Police Department investigated the shooting. Officer Tommy Rigsby assisted in the investigation. Officer Rigsby had worked with Jackson for several years at a previous job on an assembly line at a local business. Officer Rigsby testified that Jackson had never exhibited signs of aggression, and that he had never known Jackson to have a temper. Nonetheless, after interviewing Gholar, Bolton, and Ruffin, who claimed “Jack, the security guard” at the club, was a shooter, Jackson became the primary, and only, suspect.
¶ 11. The interviews of Gholar, Bolton, and Ruffin did not occur until over two weeks after the shooting. The photographic lineup with Jackson’s picture in it was not presented to Bolton or Ruffin until after the interviews took place. No other possible leads were pursued despite Gho-lar’s alleged gang affiliation. Furthermore, Gholar was not questioned as to any bias or retaliatory feelings he may have had toward Jackson due to Jackson removing him from the club. Likewise, Bolton was not questioned regarding the same, despite the fact that she had been removed from the club by Jackson on numerous prior occasions when he was a security guard. Officer Rigsby also admitted that after speaking with Gholar, Bolton, and Ruffin, no other witnesses were questioned. No crime-scene investigation was conducted to obtain evidence after the incident; hence, there was no physical evidence collected or presented as evidence during the trial. Nonetheless, Jackson was charged with multiple counts of shooting into a dwelling.
¶ 12. At Jackson’s trial, the defense attempted to provide alternate theories of a motive for the shooting. Namely, the defense attempted to reference Gholar’s gang affiliation as a potential motive for someone other than Jackson to wish Gho-lar harm. Although the circuit court judge overruled the prosecution’s objections to the defense’s line of questioning, the judge nonetheless retorted on several occasions, in the presence of the jury, that the alternate theory was “irrelevant.”
¶ 13. The defense hinged its theory of the case on the notion that Jackson would not have had time to leave the club’s parking lot around 4:15 or 4:20, put air in his tires, drive home to his apartment, and drive back to Gholar’s apartment complex in time to coincide with the 4:24 a.m. 911 call advising of shots being fired. The prosecution never presented evidence as to how long it would have taken Jackson to drive from the club to Gholar’s apartment complex or from the club to his own home. However, Jackson asserts that it is approximately the same distance from the club to both locations. As such, Jackson claims it is nearly impossible for him to have arrived in a different vehicle with other people in the vehicle and to have been present during the shooting some *62 where between four and nine minutes after leaving the club in his own car — especially since he had to travel extraordinarily slowly in his car due to his tires being slashed.
¶ 14. Nonetheless, the jury found Jackson guilty of three counts of shooting into an occupied dwelling. Despite the fact that Jackson had no prior criminal record, the circuit court judge • sentenced him to ten years on each count with the sentences to run consecutively to one another, for a total sentence of thirty years in the custody of the MDOC. Jackson filed a motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial. The motion was denied. Jackson now appeals, claiming the circuit court erred by denying the motion and that the circuit court judge’s commentary in front of the jury regarding the defense’s alternate theory regarding motive was improper.
DISCUSSION
¶ 15. In reviewing the denial of a motion for a JNOV or a new trial, we analyze the circuit court’s decision under an abuse-of-discretion standard. Vaughn v. State, 972 So.2d 56, 59 (¶ 11) (Miss.Ct. App.2008) (citing Dilworth v. State, 909 So.2d 731, 736 (¶ 17) (Miss.2005)). The critical inquiry in reviewing the denial of a motion for a JNOV is whether the evidence showed, beyond a reasonable doubt, that the accused committed the crime. Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005). Nonetheless, an appellate court should not question “whether it ‘believes that the evidence at the trial established guilt beyond a reasonable doubt.’ Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Id. (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).
¶ 16. In the case at bar, Jackson was charged with multiple counts of shooting into a dwelling. At trial, although no physical evidence was presented, the State did produce several witnesses. Two of the witnesses were Bolton and Ruffin, who each testified as eyewitnesses to the crimes. They both testified on the stand that Jackson was the shooter. They also identified Jackson in a photographic lineup during the investigation. Jackson also testified at trial and disputed the testimonies of Bolton and Ruffin. During his testimony, Jackson noted the potential biases that Bolton and Ruffin may have had against him for his work as a security guard at the club. Jackson’s attorney also pointed out the inconsistency in Ruffin referencing Jackson as “the short one” despite Jackson’s six-foot-four-inch frame.
¶ 17. We have long held that on issues of witness credibility, “[t]he jury determines the weight and credibility of witness testimony.” Nelson v. State, 10 So.3d 898, 905 (¶ 29) (Miss.2009). As such, while the witnesses’ testimonies varied, it was for the jury to determine whom to believe, and we find there was sufficient witness testimony for a rational juror to have found Jackson guilty.
¶ 18. Jackson next asserts that the circuit court erred in denying his motion for a new trial. A motion for a new trial tests the weight of the evidence. Vaughn v. State, 926 So.2d 269, 271 (¶ 4) (Miss.Ct.App.2006) (citing Hawthorne v. State, 835 So.2d 14, 22 (¶ 32) (Miss.2003)). We have held that matters regarding the weight of the evidence are within the province of the jury. Stegall v. State, 765 So.2d 606, 610 (¶10) (Miss.Ct.App.2000). “When reviewing a denial of a motion for a new trial,” this Court “will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to *63 allow it to stand would sanction an unconscionable injustice.” Bush, 895 So.2d at 844 (¶ 18).
¶ 19. Again, despite the lack of physical evidence against Jackson, substantial witness testimony existed and was presented to the jury linking him to the alleged crimes. Two eyewitnesses testified to having seen Jackson shooting into the apartments at issue. The jurors considered the evidence presented to them and determined that Jackson was guilty. Matters regarding the weight of the evidence are to be settled by the jury, and we will only intervene if the weight of the evidence is overwhelmingly contrary to the verdict. Id. Based on the eyewitnesses’, testimonies presented at trial, we cannot say that the evidence was so contrary to the verdict to warrant a new trial. This issue is without merit.
¶ 20. Jackson next asserts that the circuit judge’s commentary in the presence of the jury was prejudicial. The circuit judge’s commentary was as follows:
The Defense: Is [Gholar] in a gang?
The State: Objection. Relevance.
The Defense: It’s relevant, Your Honor, I’m trying....
The Court: Where are you going with this?
The Defense: I’m just trying to establish that somebody else might have had a reason to shoot at [Gholar],
The Court: I’ll allow it, but I don’t see where it’s relevant at all.
Later, a similar line of questioning occurred:
The Defense: Has [Gholar] been in trouble a lot?
The State: Objection to relevance, Judge, at this point.
The Court: Where are you going,' [counselor]?
The Defense: Your Honor, I’m just trying to establish that it could have been
somebody else who had a motive to shoot at ... Gholar.
The Court: I don’t see how that has any bearing.
The Defense: May I ask it? I’m almost finished.
The Court: Go ahead. Let’s move along.
The defense again opened a-line of questioning during the examination of another witness regarding Jackson’s temperament and the likelihood of him committing the crime at hand. The State objected, and the following dialogue took place:
The State: Objection as to relevance.
The Defense: It’s relevant as to my client having the kind of temper that
[[Image here]]
The Court: I really don’t believe it is, but I’ll allow it. Move along. If you’d move along quickly, please.
¶21. On appeal, Jackson asserts that the circuit judge’s commentary “not only let[] the jury know the court believe[d] that only Jackson could have done the shooting but clearly deprive[d] Jackson of his fundamental right to the presumption of innocence.” However, we have long held that an objection to alleged erroneous behavior must be made contemporaneously with the behavior in order to preserve the issue for appeal. Smith v. State, 797 So.2d 854, 856 (¶9) (Miss.2001). The supreme court has held that “[t]he assertion on appeal of grounds for an objection which was not the assertion at trial is not an issue properly preserved on appeal.” Ballenger v. State, 667 So.2d 1242, 1256 (Miss.1995) (citations omitted). In sum, “[a] trial judge will not be found in error on a matter not presented to him for decision.” Id. (citations omitted). As such, this issue is not properly before us. We will not rule on the merits of an issue that was not first brought before the circuit judge.
*64 ¶ 22. THE JUDGMENT OF THE FORREST COUNTY CIRCUIT COURT OF CONVICTION OF COUNTS II, III, AND IV, SHOOTING INTO A DWELLING, AND SENTENCE OF TEN YEARS ON EACH COUNT, WITH TEN YEARS SUSPENDED FOR COUNT IV ONLY, FOLLOWED BY FIVE YEARS OF POST-RELEASE SUPERVISION, AND TO PAY A $5,000 FINE AND $250 IN RESTITUTION TO THE FORREST COUNTY PUBLIC DEFENDER’S FUND AND $100 TO THE MISSISSIPPI CRIME VICTIMS’ COMPENSATION PROGRAM, WITH ALL SENTENCES TO RUN CONSECUTIVELY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ROBERTS, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. JAMES, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.