IRVING, J., for the Court.
 

 ¶ 1. Damita Ann Hill was convicted of felonious child abuse by a Harrison County jury and was sentenced to twenty years in the custody of the Mississippi Department of Corrections by the Harrison County Circuit Court. Feeling aggrieved, she appeals and asserts that the circuit court lacked jurisdiction over her case, or, in the alternative, that her conviction is against the overwhelming weight of the evidence and that the evidence is insufficient to support her conviction.
 

 ¶ 2. Finding no reversible error, we affirm.
 

 FACTS
 

 ¶ 3. Hill was employed by the United States government as a servicewoman at Keesler Air Force Base on the Mississippi Gulf Coast. Hill lived on the base with her husband, Douglas Hill. On June 29, 2004, the couple’s first child, A.A., was rushed to the hospital after he was discovered by Douglas in his crib, acting “lifelessly” with
 
 *592
 
 a red face and a swollen eye. A.A. was nine weeks old at the time.
 

 ¶ 4. At the hospital, A.A. was seen by multiple doctors and was treated for a variety of injuries, the most serious of which was a head injury that had led to cranial hemorrhaging. Dr. Jennifer Stan-gle, one of the doctors that treated A.A., was the first witness to testify for the State. Dr. Stangle testified that she is a pediatrician employed by the United States Air Force. Dr. Stangle indicated that when she treated A.A. in 2004, she was doing her residency at Keesler Ah’ Force Base. Dr. Stangle was ultimately accepted as an expert in pediatric medicine.
 

 ¶ 5. Dr. Stangle testified that she learned that A.A. was nine weeks old, that he “had some swelling of his left eye, that he initially had some dropping of his heart rate, or bradycardia, and had thrown up a couple of times.” Dr. Stangle described her initial meeting with A.A. and his parents:
 

 At that point I was talking to them and examining the patient at the same time. So in doing that, I undressed the patient. I saw further bruising on the back and on the lower buttocks area. And so when I saw that, I then walked out of the room. I went and talked to the ER staff and to the other resident, and then we notified the child protective services, and we arranged for a CAT scan of the head.... Because we were concerned that there could be bleeding in the head because of the injuries on the face.
 

 When asked about the results of the CAT scan, Dr. Stangle testified that there was “bleeding in multiple places over the child’s brain.... It meant that there had been serious injury to the head of the infant and that it was fairly recent.” After observing the results of the CAT scan, Dr. Stangle conferred with the attending neurologist before admitting A.A. to the ICU “for close monitoring.” Dr. Stangle explained the risks involved with bleeding in the brain: “anytime you have a bleed in the brain, you run the risk of developing hydrocephalus, or fluid, around the brain and decompensating from there, your heart rate going down, your respiration’s going down, and herniation.” Dr. Stangle testified that A.A.’s injuries were “absolutely” life-threatening.
 

 ¶ 6. Dr. Stangle explained that they performed a series of tests on A.A.’s liver to see if certain enzymes were elevated. She testified that all of A.A.’s test results showed an elevated level of liver enzymes. Dr. Stangle explained to the jury that elevated liver enzymes indicate either “chronic liver disease problems or ... acute injury.” Dr. Stangle testified that A.A.’s liver enzymes decreased rapidly in the days following his admission to the hospital, which indicated that the elevated levels were not due to a chi’onic condition. In discussing how A.A. might have received an injury to his liver, Dr. Stangle testified: “[Tjhere was an injury to the liver, that it had been — we see that often in car accidents, or if someone were to get in a fight and get punched in the stomach, we’ll see that also.” When questioned as to whether either of AA.’s parents had related an incident that might have caused the injury to A.A.’s liver, Dr. Stangle testified: “No. And I specifically asked had there been any recent car accidents, falls, anything, and the answer was no. And there had been no one else taking care of the patient. I asked that also. No day care, no kids in the house, no other adults in the house.” Dr. Stangle stated her ultimate conclusion as to A.A.’s liver test results as: “The only other reason would be that the child had been hit in the stomach with something.”
 

 
 *593
 
 ¶ 7. Dr. Stangle also testified regarding x-rays that were taken of A.A. later in the day after his admission to the hospital: “We saw an old rib fracture on the ninth rib. We saw two new fractures, one above the knee on the left, below the knee on the right, and then another older one on the left below the knee.” Dr. Stangle opined that some of the injuries to A.A.’s legs could have only been caused by “shearing force, meaning that you’re pulling rapidly or you’re twisting rapidly or you’re doing both rapidly.” Dr. Stangle explicitly stated that A.A. would not have been able to cause the injuries to himself because of his young age.
 

 ¶ 8. Dr. Stangle related to the jui-y the other injuries that she observed when she examined A.A.:
 

 When I looked at the child when I was doing my exam, I also saw bruising on the right back rib cage area. And around towards [sic] the side, or the flank, there was also — and those were linear, so kind of in a line.
 

 And then there was also a bruise in the back over the gluteal area kind of where your hips are, in that area, that was circular, another bruise. And there was one at the base of the neck.
 

 They were darker bruises. Some had yellow in them. They were different colors, kind of brown.
 

 Acute bruising is red. And then over typically a few days or more you’ll start seeing the brown and yellow colors start to come in. It’s just the resolution of the red blood cells as the body is getting rid of them.
 

 From the color of the bruises, Dr. Stangle concluded that many of those injuries were older than the injury to A.A.’s head.
 

 ¶ 9. The following colloquy between Dr. Stangle and the prosecutor summarizes Dr. Stangle’s conclusions as to how A.A. was injured:
 

 Q. Doctor, after your examination and treatment of nine-week-old [A.A.], did you determine, in your opinion, based on a reasonable degree of medical certainty, how the child received these injuries?
 

 A. Yeah. It was our opinion and my opinion that the child had been intentionally harmed or injured.
 

 Q. Any way the child could have injured himself?
 

 A. No.
 

 Q. Any way the child could have bruised himself as shown in these photographs?
 

 A. No.
 

 Q. Any way the child could have broken his own legs?
 

 A. No.
 

 Q. Any way the child could have caused the bleeding in the brain by himself by some type of action?
 

 A. No.
 

 Q. Did you also look at whether there was any type of medical problem associated with this child so as to have a medical condition or an illness or a disease that would cause these types of problems?
 

 A. Right. We did look at out phos. and calcium [sic], which are markers for kind of the brittle bone disease that you hear about in children, and those were normal. So wouldn’t [sic] be spontaneously having fractures.
 

 And then we also looked at his ability to clot blood which could cause spontaneous bleeding, and those were normal. And then his newborn screen was normal also, telling us that he didn’t have abnormal hemoglobin or
 
 *594
 
 red cells that would affect his ability to clot.
 

 Finally, Dr. Stangle testified that the injuries to A.A. most likely had been inflicted at different times, with the most recent injury occurring within the prior six to twelve hours.
 

 ¶ 10. During cross-examination, Dr. Stangle was asked whether A.A.’s injuries could have resulted from an accident:
 

 Q. In fact, this could have been an accident, correct?
 

 A. I don’t believe so, no.
 

 Q. Why is that?
 

 A. I can think of no accident that would cause the injuries this child had.
 

 Q. Well, you stated earlier that, you know, it could have been a car accident or it could have been, you know, some other trauma.
 

 A. Right. Certain things. Say, if you were in a seat belt and you had a seat belt injury, that could cause liver injury. But all the constellations of things with one would not apply to one accident.
 

 ¶ 11. Dr. Stangle was also questioned regarding A.A.’s admission to the hospital about ten days prior to his head injury.
 
 [1]
 
 During that visit, there was no note of broken bones or extensive bruising. When asked as to why A.A.’s injuries that predated that visit were not observed, Dr. Stangle opined: “Because these kind of fractures in infants you don’t see any gross deformities, you don’t necessarily see bruising over the skin. So unless you’re looking, you’re not going to see them, meaning unless you take an x-ray you’re not going to see them.”
 

 ¶ 12. Dr. Benjamin Weintraub, another physician who treated A.A. at the hospital, also testified for the State. Dr. Weintraub explained that he is a pediatrician employed with the United States Air Force. At the time of AA.’s hospital admission, Dr. Weintraub was the senior resident at the Keesler Air Force Base hospital pediatric ward. Dr. Weintraub was admitted as an expert in the field of pediatrics. Dr. Weintraub’s testimony was largely consistent with Dr. Stangle’s testimony.
 

 ¶ 18. When questioned as to how much force would have to have been applied to A.A.’s head in order to cause the injury that he sustained, Dr. Weintraub explained:
 

 It takes a significant amount of trauma or a force to cause those types of bleeds within the brain. The types of bleeds specifically that was seen see [sic] was something called a subdural hematoma, which is a collection of blood between the layer, or the dura, which is a thick or fibrous tissue that surrounds or en coats [sic] the brain and the brain tissue itself.
 

 Those forces, in order to obtain that sort of injury, it requires either a significant amount of blunt force trauma, a very strong strike that is seen, for example, on a very high impact motor vehicle collision or from shearing forces from rapid acceleration, deceleration, and twisting from a shaking or type motion as well can cause those injuries.
 

 Dr. Weintraub testified that hitting a baby’s head on the side of a crib or a wall would not cause the degree of injury that A.A. sustained. Like Dr. Stangle, Dr. Weintraub stated that the variety of injuries that A.A. had sustained were not attributable to a single source.
 

 
 *595
 
 ¶ 14. During cross-examination, Dr. Weintraub was questioned regarding his observations of Hill and Douglas when he met with them at the hospital. Dr. Wein-traub stated that Hill seemed very upset and anxious, whereas Douglas was quieter and had trouble making eye contact with Dr. Weintraub. Dr. Weintraub ultimately concluded that A.A. had suffered significant injuries and that A.A. could not have caused the injuries to himself.
 

 ¶ 15. The State next called Special Agent Larry Michael Hebdon Jr., an agent with the Air Force Office of Special Investigations at Keesler Air Force Base. Special Agent Hebdon interviewed Douglas on June 29, 2004. Special Agent Hebdon testified that because “the base falls within the Second District, it becomes concurrent jurisdiction” between the federal government and the State of Mississippi as to jurisdiction to try criminal cases.
 

 ¶ 16. Finally, the State called Special Agent Heath Humble, who was also employed at Keesler Air Force Base in the Air Force Office of Special Investigations. Special Agent Humble interviewed Hill on June 29, 2004. Special Agent Humble testified that Hill and Douglas resided at 429 Pinelawn Drive in Biloxi, Mississippi, which is located on Keesler Air Force Base. Special Agent Humble related a statement that Hill gave the Air Force investigators wherein she described getting up in the middle of the night to feed A.A.: “I rocked him, and he failed to go to sleep. Through my frustration I hit him. I did not intentionally hit him. It was caused from all the pressures I am currently undergoing....” Hill told Special Agent Humble that, after she hit A.A., she picked him up and rocked him until he fell asleep. Special Agent Humble also testified about a statement Hill gave wherein she claimed that she accidentally hit A.A.’s head on the side of his crib as she put him back that night. Hill’s written statement indicated that: “On a scale of one to ten, it would score an eight. I did not bite my child. His head hit not quite as hard as being hit with a baseball bat upside the head.”
 

 ¶ 17. Special Agent Humble testified that Hill gave investigators multiple written statements over the course of several hours, and that her story kept changing in the different statements. In her first statement, Hill stated that she had not hit A.A. In the second statement, Hill admitted to hitting A.A., and in the third statement, she described the severity of the blow that A.A. took when he hit the side of his crib.
 

 ¶ 18. Hill and Douglas both testified at the trial. During her testimony, Hill claimed that she accidentally hit A.A.’s head on the side of his crib. However, Hill testified that there was no visible injury to A.A. after she hit his head on the crib. Hill explained that her second statement to Special Agent Humble, wherein she admitted to hitting A.A. out of frustration, was untrue and was the result of coercion:
 

 That was a statement I had made after spending several hours under interrogation in the OSI office. I had written a previous statement saying that I would never intentionally harm my child. I would never hurt anyone in any way. And I hadn’t eaten. I hadn’t been sleeping. I didn’t know what was going on with our son being rushed into the emergency room. I’ve got all these emotions tied up.... And the officers kept saying, you did this, you did this. If you don’t admit to doing this, then you’re going to go to jail. They said, if you admit to hitting your child, that we’ll give you anger management classes. And in my young mind I’m thinking, okay, anger management is better than
 
 *596
 
 going to jail. I didn’t plan on going to jail ever in my life. So I wrote the statement saying that I hit my child.
 

 ¶ 19. Under cross-examination, Hill also retracted her statement describing the hit on the side of the crib as an eight out of ten. Hill then demonstrated with a box of tissues how hard she hit A.A. on the side of the crib. She described the hit as forceful as a four on
 
 a
 
 scale of one to ten. Hill admitted that she did not inform Douglas of the impact involving the crib at any time. Hill had no explanation for the multiple bruises and injuries to A.A., even though she admitted that she regularly bathed A.A. and changed his diapers.
 

 ¶ 20. As to A.A.’s broken legs, Hill attempted to explain as follows:
 

 I know that there was a time, like I said, he was constipated for a while. And one of my friends had told me if I pushed his—
 

 [OBJECTION],
 

 One of my friends had told me if I pushed my son’s legs up and down, that would manipulate bowel to come down, because he hadn’t used the bathroom for several days. And me being a first-time mother, I was willing to try anything to get my son to use the bathroom, because he was fussy. I didn’t know if he was fussy because he was constipated or not. So I pushed his legs up and down, and that’s the only contact I really had with his legs.
 

 Regardless of this explanation, Hill testified that she did not move A.A.’s legs sufficiently hard enough to cause the fractures that the doctors had described.
 

 ¶ 21. Hill also had no explanation for the acute injury to A.A.’s liver. Her only explanation for the serious head trauma that he had sustained was that Douglas had told her that A.A. fell from his “bouncy seat” at some point. However, expert testimony indicated that a mere fall from a seat would not be sufficient to cause the severity of injury that A.A. had sustained.
 

 ¶ 22. Like Hill, Douglas had little explanation for A.A.’s head injury other than his fall from a seat. Douglas also related an incident where A.A. fell asleep in a highchair and bumped his head. Douglas testified that the bump to A.A.’s head from the highchair was “not extremely hard.” Douglas did state that A.A. had been diagnosed as having “Mongolian spots” and that Douglas’s research had indicated that Mongolian spots could be mistaken for bruises. Douglas theorized that A.A.’s liver damage might have been the result of his seatbelt being buckled too tightly. As to A.A.’s broken bones, Douglas had no explanation.
 

 ¶ 23. Immediately prior to trial, Hill’s counsel argued that the court lacked jurisdiction over Hill because she was a servicewoman whose crime had been committed on Keesler Air Force Base. Hill’s attorney contended that the federal government enjoys exclusive jurisdiction over Keesler Air Force Base. The circuit court disagreed and allowed the trial to proceed. Hill was ultimately found guilty and sentenced to twenty years’ confinement.
 

 ¶ 24. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
 

 ANALYSIS AND DISCUSSION OF THE ISSUES
 

 1. Jurisdiction
 

 ¶ 25. In her first issue, Hill asserts that the circuit court lacked jurisdiction to try her case. On October 15, 2009, this Court ordered the circuit court to conduct an evidentiary hearing regarding whether the circuit court had jurisdiction over this case. A hearing was subsequent
 
 *597
 
 ly held on November 13, 2009, and was concluded on November 24, 2009. Having reviewed the evidence at trial and at this evidentiary hearing, we find that the circuit court properly determined that it had jurisdiction over Hill.
 

 ¶ 26. At trial, the State argued:
 

 Your Honor, as the Court is aware, Keesler Air Force Base ... has now and always is part of the municipality of the City of Biloxi. In fact, many years ago at the time that Keesler Air Force Base was established, the boundary line or the western boundary line of the city of Biloxi was in fact Rodenburg.
 

 This is a housing — as the Court may be aware of, if you go north on Rodenburg and you come to the gate there, the Keesler gate, and you proceed past that gate, this is some housing right to the east or to the right of Rodenburg.
 

 This was property originally owned by the City of Biloxi, donated by the municipality of the City of Biloxi to Keesler where they have historically from the inception of Keesler Air Force Base maintained simultaneous jurisdictions of Keesler Air Force Base and Biloxi, City of Biloxi.
 

 There has never been any federal mandate taking exclusive jurisdiction for the possibility of criminal prosecution on that land. So it was owned by the city. It was donated to Keesler for housing. They’ve agreed to have joint jurisdiction over the property, and it has always remained as such, Your Honor.
 

 In response, Hill’s attorney directed the circuit court’s attention to
 
 United States v. State Tax Commission of Mississippi,
 
 421 U.S. 599, 95 S.Ct. 1872, 44 L.Ed.2d 404 (1975), and argued that the federal government enjoys exclusive jurisdiction over Keesler Air Force Base.
 

 ¶ 27. In
 
 State Tax Commission,
 
 the United States Supreme Court ruled on the validity of a Mississippi Tax Commission regulation that required out-of-state distillers and suppliers to collect from military installations in Mississippi.
 
 Id.
 
 at 600-01, 95 S.Ct. 1872. In ruling on this issue, the Supreme Court necessarily discussed whether the federal government has jurisdiction over Keesler Air Force Base. At the outset, the Court noted that: “The United States has four military installations in the State. Exclusive federal jurisdiction is exercised over two of the installations, Keesler Air Force Base and the Naval Construction Battalion Center.”
 
 Id.
 
 at 601, 95 S.Ct. 1872. The Court went on to explain as follows in a footnote:
 

 The United States acquired.exclusive jurisdiction over the lands composing Keesler Air Force Base under the terms of s 1, 84 Stat. 835, 40 U.S.C. s 255,
 
 [2]
 
 in a series of letters between the Governor of Mississippi and the Secretary of War. On January 9, 1945, Secretary of War Stimson wrote Governor Bailey acknowledging the acquisition of exclusive jurisdiction as required by s 255: “Accordingly, notice is hereby given that the United States accepts exclusive jurisdic
 
 *598
 
 tion over all lands acquired by it for military purposes within the State of Mississippi, title to which has heretofore vested in the United States, and over which exclusive jurisdiction has not heretofore obtained.”
 

 Id.
 
 at 601 n. 2, 95 S.Ct. 1872 (footnote added).
 

 ¶ 28. At the November evidentiary hearings, several witnesses testified on behalf of the State. Officer Earl Grimes, of the City of Biloxi Police Department, testified that he met with federal law enforcement officers, who presented him with maps showing the jurisdictional boundaries within Keesler Air Force Base. Officer Grimes also testified that the federal officers encouraged the Biloxi police to take the case “because of the husband being a non-military member and the wife being a military member, and they wanted them prosecuted in the same court.” Officer Grimes also testified that the federal officers believed that the State of Mississippi and the federal government enjoyed concurrent jurisdiction over the residence that Hill lived at in June 2004.
 

 ¶29. Officer John Miller, also of the City of Biloxi Police Department, testified at the November 13 hearing. Like Officer Grimes, Officer Miller testified that the federal officers showed him a map that showed Hill’s 2004 residence as within the concurrent jurisdiction of the State of Mississippi and the federal government. Officer Miller further testified that he also “rode out to the property to see it,” after which Officer Miller concluded that there was concurrent jurisdiction over the house. Officer Miller testified that the area containing Hill’s residence is “jointly policed” by the Biloxi police and federal law enforcement officers. He explained that the Biloxi police are “free to roam that area, drive onto the property whenever an officer needs to.”
 

 ¶ 30. Brent Richardson, an attorney adviser for the United States Air Force, also testified at the November 13 hearing. Richardson testified that he had been contacted to help research whether the State of Mississippi and the federal government possessed concurrent jurisdiction over Hill’s residence in 2004. Richardson testified that Hill’s 2004 residence is in a proprietary area, which means that the federal government “own[s] the land, but only [has] the rights that an ordinary proprietor of land would have. In other words, [the federal government] could only make civil arrests. [It] couldn’t investigate any crimes that occurred in that area.” Richardson further explained that he has had to determine the jurisdictional boundaries at Keesler Air Force Base on multiple occasions because he is “a Special Assistant U.S. Attorney, [who] prosecute[s] the civilian misdemeanors at Keesler.” Richardson testified that he is familiar with the deeds and agreements that govern the jurisdiction over Keesler Air Force Base. During cross-examination, Richardson clarified that even in proprietaiy areas, the military would have jurisdiction over military personnel if the military chose to exercise such jurisdiction. Richardson stated that the area containing Hill’s residence was not part of the original land ceded to the federal government in 1945, but that it was acquired by the federal government later, although Richardson did not know exactly when.
 

 ¶ 31. When the circuit court and the parties reconvened on November 24, the prosecutor offered additional documents into evidence. Notable among them was an unfiled eminent domain petition, dated December 3, 1958, showing that the federal government was attempting to take the property containing Hill’s residence. A map that was admitted into evidence showed that the land in question was deed
 
 *599
 
 ed to the federal government on December 22,1958.
 

 ¶ 32. After argument, the circuit court found that it had jurisdiction over the case:
 

 First, for the record, let me say that Keesler Air Force Base was, in fact, land was acquired in some 1945[sic]. At that time there was an acceptance or a session [sic], as they call it, in which the federal government exercised exclusive jurisdiction over those properties that it acquired. That is commonly referred to as Keesler Air Force Base.
 

 This property where this incident took place is not within the properties that were acquired in 1945. They were, in fact, acquired in 1958.
 

 The question was to determine whether or not 429 Pinelawn Drive in Biloxi, Mississippi^] is within the confines of Keesler U.S. Air Force Base, and, two, if it is within the confines of Keesler U.S. Air Force Base, whether the United States government has exclusive jurisdiction of criminal offenses occurring within the confines of Keesler Air Force Base.
 

 Certainly, if this incident would have taken place on the base itself within the walls or fences of the property that was acquired in 1945, the federal government would have exclusive jurisdiction. This property was outside of those fences. Whether it is considered Kees-ler Air Force Base or not is really irrelevant because it is property that was acquired by the federal government and that no acceptance of exclusive jurisdiction was ever made.
 

 Therefore, it is the ruling of this [e]ourt that the federal government has a proprietary interest and a proprietary interest alone, and this property was used as housing.
 

 And there is the City of Biloxi or the Biloxi Police Department, thereby the State of Mississippi has the jurisdiction and authority to investigate and prosecute state offenses on the property in which this offense took place.
 

 ¶ 33. A federal statute, 40 United States Code section 3112, mandates that the federal government must file a notice before taking exclusive jurisdiction over a piece of land that it has acquired:
 

 (a) Exclusive jurisdiction not required. — It is not required that the Federal Government obtain exclusive jurisdiction in the United States over land or an interest in land it acquires.
 

 (b) Acquisition and acceptance of jurisdiction. — When the head of a department, agency, or independent establishment of the Government, or other authorized officer of the department, agency, or independent establishment, considers it desirable, that individual may accept or secure, from the State in which land or an interest in land that is under the immediate jurisdiction, custody, or control of the individual is situated, consent to, or cession of, any jurisdiction over the land or interest not previously obtained. The individual shall indicate acceptance of jurisdiction on behalf of the Government by filing a notice of acceptance with the Governor of the State or in another manner prescribed by the laws of the State where the land is situated.
 

 (c) Presumption. — It is conclusively presumed that jurisdiction has not been accepted until the Government accepts jurisdiction over land as provided in this section.
 

 We read this statute to mean that the federal government must file “a notice of acceptance with the Governor of the State or in another manner prescribed by the laws of the State where the land is situated” before taking exclusive jurisdiction
 
 *600
 
 over a piece of property that it has acquired.
 

 ¶ 34. The documents provided to the circuit court indicate that the federal government acquired the property with Hill’s residence on it in December 1958. While there is evidence supporting a finding that the federal government has exercised exclusive jurisdiction over the land it acquired in 1945, there is nothing to indicate that a similar claim has been made in regard to the land it acquired in 1958, which is the acquisition that included Hill’s 2004 residence. Therefore, we find that substantial evidence supports the circuit court’s finding that it had jurisdiction over Hill.
 

 ¶ 35. This issue is without merit.
 

 2. Sufficiency of the Evidence
 

 ¶ 36. Hill asserts that the evidence is insufficient to sustain her conviction. The sufficiency of evidence supporting a conviction is properly challenged by either a motion for a directed verdict or by a motion for a judgment notwithstanding the verdict.
 
 Nelson v. State,
 
 10 So.3d 898, 905(¶ 29) (Miss.2009). The
 
 Nelson
 
 court explained our standard of review when examining the sufficiency of the evidence supporting a conviction:
 

 To determine whether the evidence is sufficient to sustain a conviction in the face of a motion for directed verdict or for judgment notwithstanding the verdict, the critical inquiry is whether the evidence shows “beyond a reasonable doubt that accused committed' the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.”
 
 Carr v. State,
 
 208 So.2d 886, 889 (Miss.1968). The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
 

 Id.
 
 (quoting
 
 Jones v. State,
 
 904 So.2d 149, 153-54(¶ 12) (Miss.2005)). We note at the outset that it is the responsibility of the jury to “determin[e] the weight and credibility of witness testimony.”
 
 Id.
 
 (citing
 
 Moore v. State,
 
 933 So.2d 910, 922(¶ 43) (Miss.2006)).
 

 ¶ 37. The crime of felonious child abuse is found at Mississippi Code Annotated section 97-5-39(2)(a) (Rev.2006), which reads:
 

 Any person who shall intentionally (i) burn any child, (ii) torture any child or, (iii) except in self-defense or in order to prevent bodily harm to a third party, whip, strike or otherwise abuse or mutilate any child in such a manner as to cause serious bodily harm, shall be guilty of felonious abuse of a child and, upon conviction, shall be sentenced to imprisonment in the custody of the Department of Corrections for life or such lesser term of imprisonment as the court may determine, but not less than ten (10) years. For any second or subsequent conviction under this subsection, the person shall be sentenced to imprisonment for life.
 

 In the context of child abuse cases, serious bodily injury is “bodily injury which creates a substantial risk of death, or permanent or temporary disfigurement, or impairment of any function of any bodily organ or function.”
 
 Buffington v. State,
 
 824 So.2d 576, 580(¶ 15) (Miss.2002) (quoting
 
 Wolfe v. State,
 
 743 So.2d 380, 385 (¶¶ 23-24) (Miss.1999)).
 

 ¶ 38. Hill essentially argues that there was insufficient evidence to show that it
 
 *601
 
 was she, rather than Douglas, who caused the injuries to A.A. She specifically argues: “When looking at the States [sic] case it is clear that there was no evidence put forth that [Hill] intentionally harmed her child.” As we have already noted, the jury is the proper judge of the credibility of witness testimony. In Hill’s written statement to the police, she admitted to striking A.A. out of frustration: The jury was not required to accept her retraction of that statement at trial. Clearly, there is evidence in the record to suggest that Hill intentionally struck A.A.
 

 ¶ 39. There is ample evidence to show that A.A. suffered serious bodily injury. Both doctors testified that A.A.’s injuries were life-threatening. Both doctors further testified that A.A. could not have caused the injuries to himself. There is nothing in the record to suggest that someone other than Hill or Douglas ever had custody or care of A.A. We note that Douglas testified that Hill took care of A.A. in the middle of the night, and that he did not see A.A. until approximately ten in the morning, when he noticed that A.A. had sustained an injury to his head and appeared to be lifeless. The jury was entitled to believe this testimony and disbelieve Hill’s testimony that A.A. was healthy when Hill left for work in the morning. As to any suggestion that A.A.’s head injury might have been caused by an accidental impact with the side of his crib, Dr. Weintraub emphatically stated that the severity of the head injury indicated more than an accidental strike against the side of a crib.
 

 ¶ 40. Like her husband, Hill had no explanation for the injuries that her nine-week-old child had sustained. We find that the circuit court gave an excellent summary of the case against Hill during the sentencing hearing in this case:
 

 Mr. and Mrs. Hill, I agree to an extent that your inexperience and youth being first-time parents and just flat out accidents, the business of raising newborn children is a slippery slope for first-time parents. No question about it.
 

 And mistakes are made and accidents happen, and you learn from those, and that’s how you become better parents. I’m satisfied of that, because I know I went through it myself.
 

 The overwhelming and uncontradicted evidence with respect to the course of conduct which led to the multiple injuries of this child are not evidence, in this Court’s mind, of inexperience and youthfulness.
 

 Broken bones, spiral, what I refer to and I know as spiral fractures, jerking, twisting fractures, ribs, kidney damage, and brain hemorrhaging are not acts of inexperience and negligence. They are acts of brutality. And nothing you say can explain how that child in nine weeks suffered the amount of trauma that [he] did. There is no explanation.
 

 And Mr. Hill, it wasn’t the failure to properly buckle in in [sic] a jump seat or too tight of a seat belt or rubbing his head against the crib putting him down, M[r]s. Hill. He didn’t get those injuries that way.
 

 * * * *
 

 Today .... twelve fair impartial jurors unanimously agreed, in the Court’s mind, [to] the only decision they could have come to based on the evidence, that each of you over the course of that nine weeks contributed to the felony child abuse of [A.A.]....
 

 Having reviewed the record, it is clear that a rational trier of fact could have found Hill guilty, beyond a reasonable doubt, of every element of felonious child abuse.
 

 ¶41. This issue is without merit.
 

 
 *602
 

 3. Weight of the Evidence
 

 ¶42. Finally, Hill contends that her conviction is against the overwhelming weight of the evidence presented at trial. In reviewing the weight of the evidence, we weigh the evidence in the light most favorable to the verdict.
 
 Nelson,
 
 10 So.3d at 908(¶ 42). We will reverse only if the verdict “is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.”
 
 Id.
 
 (quoting
 
 Jones,
 
 904 So.2d at 154(¶ 14)).
 

 ¶ 43. We refer again to the facts that have been related in this opinion. Viewing the evidence in the light most favorable to the verdict, allowing it to stand does not “sanction an unconscionable injustice.”
 

 ¶44. This contention of error is also without merit.
 

 ¶ 45. THE JUDGMENT OF THE HARRISON COUNTY CIRCUIT COURT OF CONVICTION OF FELONIOUS CHILD ABUSE AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HARRISON COUNTY.
 

 KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . According to Hill, she took A.A. to the hospital because he was "fussy” and "constipated.” A.A. was ultimately diagnosed with thrush in his mouth and with constipation.
 

 [2]
 

 . Section 255 is now section 3112, and it reads in relevant part:
 

 When the head of a department, agency, or independent establishment of the Government, or other authorized officer of the department, agency, or independent establishment, considers it desirable, that individual may accept or secure, from the State in which land or an interest in land that is under the immediate jurisdiction, custody, or control of the individual is situated, consent to, or cession of, any jurisdiction over the land or interest not previously obtained. The individual shall indicate acceptance of jurisdiction on behalf of the Government by filing a notice of acceptance with the Governor of the State or in another manner prescribed by the laws of the State where the land is situated.
 

 40 U.S.C. § 3112(b) (2006).